KIRSCH HOLDING COMPANY, A CORPORATION OF THE STATE OF NEW JERSEY, PLAINTIFF-APPELLANT, v. THE BOROUGH OF MANASQUAN, A MUNICIPAL CORPORATION OF THE STATE OF NEW JERSEY, DEFENDANT-RESPONDENT (A–135).

STATE OF NEW JERSEY, BOROUGH OF BELMAR, PLAINTIFF-APPELLANT, v. L. J. SCHIER, DEFENDANT-RESPONDENT (A–140).

Argued May 25, 1971—Decided September 28, 1971.

*Mr. Theodore D. Parsons, Jr.,* argued the cause for plaintiff-appellant in A–135 (*Messrs. Labrecque, Parsons & Bassler,* attorneys; *Mr. Parsons,* on the brief).

*Mr. John D. Wooley* argued the cause for defendant-respondent in A–135.

*Mr. Harold Feinberg* argued the cause for plaintiff-appellant in A–140.

*Mr. Alphonse A. Stanzione, Jr.* argued the cause for defendant-respondent in A–140 (*Messrs. Madnick, Milstein & Mason,* attorneys; *Mr. Stanzione,* on the brief).

The opinion of the Court was delivered by

HALL, J. These cases, consolidated for argument on appeal, concern the validity of essentially identical zoning ordinance provisions of the Boroughs of Manasquan and Belmar prohibiting, *inter alia,* the "group rental" of seasonal seashore resort living accommodations.

The property owner-parties in both cases had admittedly violated the ordinances. In the Manasquan case (hereafter *Kirsch*) the action was in lieu of prerogative writ seeking a determination that the provisions were invalid and an injunction against their enforcement. The Law Division upheld the provisions and gave judgment for the Borough. 111 *N. J. Super.* 359 (1970). We certified Kirsch's appeal on our own motion before argument in the Appellate Division. In the Belmar case (hereafter *Schier*), a similar attack was made by way of defense to a municipal court prosecution for violation of the ordinance. The conviction in that court was affirmed by the Monmouth County Court, but reversed by the Appellate Division in an unreported opinion. We granted the Borough's petition for certification. 58 *N. J.* 340 (1971).

The background facts are matters of general knowledge in the section of the state bordering on the Atlantic Ocean and are not in dispute.[1] For generations the communities

---

[1] It was stipulated in *Kirsch* that the court might utilize the findings made by it in the earlier case of *Larson v. Mayor and Council of Borough of Spring Lake Heights,* 99 *N. J. Super.* 365 (Law Div. 1968). They are equally applicable in *Schier*. In *Larson,* in which Kirsch and Manasquan were also parties, the court invalidated as too sweeping substantially similar prohibitions contained in a general police power, as distinct from a zoning, ordinance, but suggested they might well be valid if enacted as provisions of a zoning ordinance. We agree with the Appellate Division's statement in *Gabe Collins Realty, Inc. v. City of Margate City,* 112 *N. J. Super.* 341 (1970), a case analogous to those before us, that "given arbitrariness or un-

along the coast have during the hot summer months experienced a large influx of people from the cities and other inland areas seeking the benefits and pleasures of seashore sun, air and water, as well as the resort amusements and entertainment available. In most of the towns, this seasonal influx finds vacation living accommodations largely by ownership or rental of summer cottages designed for that purpose or even of more substantial homes constructed for all-year living, along with less frequent use of hotels, motels or rooming houses. Manasquan and Belmar are typical resort towns in this respect. Both also have, as do most of the seashore resort communities, a substantial all-year population, which has been increasing in recent years by reason of retired people taking up permanent residence and of the availability of the Garden State Parkway and other highways as a means of rapid automobile transportation to quite distant places of employment. In most communities these all-year homes are intermixed with dwelling units occupied only during the summer season. The structures are frequently close together on small lots.

Until fairly recent years summer dwelling occupancy has been largely by conventional family units, who generally rented the accommodations for a month or the entire season. With the increased mobility of the population and the ease of travel to other parts of the country, such lengthy family stays have very frequently decreased to a week or two, with the result that property owners desiring to rent their cottages or houses seasonally must find a succession of weekly or bi-weekly tenants.

The other side of the coin, which concerns us, is the proliferation of "group rentals" during the same period. This social phenomenon entails the rental of seashore cottages,

reasonableness in classification or in impairment of property rights sufficient to nullify a regulation under the one genus of legislative authorization [the general police power], it should also ordinarily fall if adopted under the other [the zoning power]." 112 *N. J. Super.* at 347.

houses or apartments for the season to a group of young unrelated adults, which ordinarily comprises a substantial number of individuals although the lease may be in the name of only one. Generally the renters are unmarried and of one sex, and some or all of them use the property full-time during work or school vacations or on weekends. These groups are not formally organized as clubs, fraternities, sororities and the like and have no internal or external head, supervision or control. Human biology being what it is, such a group attracts friends of the other sex, who may live on the premises from time to time as well as merely visit the occupants. One result is an almost continuous overcrowding of the sleeping, cooking and sanitary facilities available. From the owner's point of view, this type of rental is a financial bonanza. He will have only one letting for the entire season, and by reason of group participation in the rental, he can secure a much higher return than a conventional family is willing or able to pay.

The evil which the ordinance provisions in question seek to prevent relates to the uninhibited social conduct of many such group rental occupants within and without the buildings. Unquestionably, and regrettably, excessive noise at all hours, wild parties, intoxication, acts of immorality, lewd and lascivious conduct and traffic and parking congestion often accompany these group rentals, making life not only unpleasant but practically unbearable to neighboring vacationers and permanent residents and having a general adverse effect on the whole municipality. In essence, they constitute a public and private nuisance by not meeting the minimal standards of expected social conduct even in this rather permissive day and age. While conventional families, with a number of children and visiting friends and relatives, can be noisy and disturbing to some neighbors, the existence of parental or family supervision and control generally prevents their conduct from exceeding the bounds of the reasonable behavior tolerance necessarily resulting from the less formal character of vacation resort living. *Cf.*

*Brundage v. Township of Randolph,* 54 *N. J. Super.* 384 (App. Div. 1959), *affirmed o. b.* 30 *N. J.* 555 (1959) ; *Hantman v. Township of Randolph,* 58 *N. J. Super.* 127 (App. Div. 1959), *certif. denied* 31 *N. J.* 550 (1960).

The property owners here involved quite candidly admit the existence of the evil, but apparently are unwilling to assist in eradicating it by voluntarily refusing to rent to such groups, undoubtedly because of the greater economic advantage to them. They urge the problem can and should be met by police enforcement of existing general police power ordinances and criminal statutes relating to noise, disorderly and immoral conduct, vehicle and traffic control and the like rather than by zoning against these group uses.

This brings us to a consideration of the ordinance provisions challenged, which represent, through amendment, refinements of previous enactments. The design of the provisions is to nip group rentals or use in the bud by prohibiting the practice and making the landlord (or the owner if he is a group user or gratuitously permits group use), the rental agent and the users subject to prosecution or injunction for violation of the prohibition. As we understand these zoning ordinances (complete copies have not been furnished us), the provisions apply in all zones of the municipalities where "one-family," "two-family" or "multi-family" dwellings are permitted uses.[2] The result is accomplished by the definition of "family" and by an express prohibitory section against group dwelling use.

---

[2] The Schier property is in a residential zone. The Kirsch properties are in the "Resort-Business" zone adjacent to the ocean, in which we understand dwelling uses as well as the gamut of usual seashore resort businesses are permitted. The various kinds of seasonal and permanent dwelling uses, which include many non-group rental dwelling uses, far exceed the number of businesses. Kirsch suggests that at least prohibition of seasonal group rentals is unreasonable in a zone permitting commercial establishments. We do not agree in view of the nature of the evil and the allowance and prevalence of residential uses in the zone. In any event, the question is not pivotal in the light of our concept of the case.

Thus the Belmar ordinance defines "family," alternatively, as follows:

### 19–2.33 Family

a. One or more persons related by blood or marriage occupying a dwelling unit and living as a single, nonprofit housekeeping unit.

b. A collective number of individuals living together in one house under one head, whose relationship is of a permanent and distinct domestic character, and cooking as a single housekeeping unit. This definition shall not include any society, club, fraternity, sorority, association, lodge, combine, federation, group, coterie, or organization, which is not a recognized religious order, nor include a group of individuals whose association is temporary and resort-seasonal in character or nature.[3]

The prohibitory section of the Belmar ordinance reads:

19–3.4 Group Rentals. No house, dwelling, building, structure or enclosure, or any part of a house, dwelling, building, structure or enclosure, within any of the zones enumerated in section 19–3.1 preceding, shall be used, or be permitted to be used, or be rented for use, as living quarters or sleeping quarters or for living purposes or sleeping purposes, by or to any society, club, fraternity, sorority, association, lodge, combine, federation, group, coterie, or organization, or to any person or member on behalf of the same, or to any group or collection of persons who are unmarried or who do not qualify as a family as defined in subsection 19–2.33 of the within chapter. This subsection shall not apply to rooming houses, hotels, motels or other places of public accommodation in the Borough of Belmar, which places are duly licensed as such by the said borough, or to recognized religious orders, convents, rectories, or parish houses or manses utilized in conjunction with any church or synagogue or similar house of worship.[4]

---

[3]The Manasquan ordinance is substantially identical except that it states that the "definition shall be deemed to include [as allowable] maids, servants or other employees of one or more members of the family." We think this would be implied anyway.

[4]The Manasquan ordinance section is the same, except that it does not contain the last sentence. The exemption of rooming houses, hotels and motels is of no real importance since such uses are generally considered business and not dwelling uses and regulated as such and do not actually involve group rentals. Seasonal group use of living quarters by non-relatives in connection with houses of worship would seemingly be barred by the Manasquan "family" definition and prohibitory section absent the exemption found in the Belmar provision. In our opinion, inclusion of this exemption in the Belmar or-

Appreciation of the full import and effect of the ordinance provisions requires that the definition and prohibitory sections be read and analyzed together. This task is not without its difficulties by reason of the obvious effort to be certain to bar obnoxious group rentals. It is plain that, in the effort to be certain to ban summer rentals by unruly groups of unrelated young adults, innocuous occupancies by other groups have been prohibited as well. A few instances will illustrate the point, without attempting to be complete.

By subsection a. of the definition section, any number of persons, so long as they are all related by blood of marriage and live as a single unit, constitute a "family" for zoning ordinance purposes, whether their dwelling occupancy be permanent or seasonal. This is obviously intended to cover one conventional "family," living together, whether it be composed of a spouse or spouses and children or of persons otherwise related. If the individuals are not so related, their joint occupancy of a dwelling is prohibited by alternative subsection b. unless it is of a permanent as distinct from a temporary and seasonal character. Thus two unrelated families of spouses and children cannot share an adequate cottage or house for the summer, nor could a small unrelated group of widows, widowers, older spinsters or bachelors — or even of judges. Likewise barred from seasonal use would be a perfectly respectable group or organization of older persons, unless (under the Belmar ordinance) they were all members of a recognized religious order. Such a non-religiously connected group would seem as innocuous as one with religious connections. Moreover, it appears that a violation would occur under subsection a. if the related family unit had house guests.

The extent of the prohibition becomes at least ambiguous and probably inconsistent when the prohibitory section is

dinance, while discriminatory against nonreligious groups, does not tip the scales in favor of its invalidity *vis-a-vis* the Manasquan ordinance.

also brought into the picture. That section makes no distinction between permanent and seasonal or temporary occupancy. It prohibits use, as well as rental, for living purposes to all the classes of organizations spelled out in definition subsection b., and any other groups or collections of persons who do not qualify as a family under the definition section. But in addition it goes on to extend the prohibition to use by any such group "who are unmarried." It is not clear whether the intended meaning is that each member of the group must be married to another person in the group, *i. e.*, requiring that the group be composed only of married couples all occupying the dwelling unit at the same time. It certainly would seem to modify or be inconsistent with the permission extended by subsection b. of the definition section to occupancy by a permanent group of unrelated individuals in requiring that the members thereof be married.

A panoramic view of these ordinance provisions indicates an effort to be certain to bar one offensive dwelling use, which at the same time results in a prohibition of many which are non-obnoxious. Perhaps the prime difficulty is that of attempting to define an unorganized group, to which a precise label cannot be affixed, without at the same time affecting other dwelling situations which present no sufficient evil. In reality the aim is to prevent anti-social conduct of a certain somewhat nebulous class of individuals by resort to prohibitions under the zoning power through a fragmentation of dwelling uses. The problem is one which has not previously reached this Court.

At the outset, it may well be questioned whether the zoning power, as delegated by the Legislature, legitimately extends so far. Justice Schaefer, speaking for a unanimous Illinois Supreme Court, felt that it did not in his thoughtful opinion in *City of Des Plaines v. Trottner,* 34 *Ill. 2d* 432, 216 *N. E. 2d* 116 (1966). There the ordinance defined "family" as "one or more persons each related to the other by blood (or adoption or marriage), together with such relatives' respective spouses, who are living together in a

single dwelling and maintaining a common household." Included within the definition as well were domestic servants and not more than one gratuitous guest residing with the "family." Convents, monasteries, rectories and parish houses were also expressly permitted in single-family residence districts. Four unrelated young men rented defendant's one-family house in a single-family residence district for common living quarters. The owner was charged with violation of the ordinance. Justice Schaefer, in reversing a prohibitory injunction, commented that the definition could hardly be regarded as an effective control upon the size of family units in prevention of the evils of intensity of use and concluded:

> The General Assembly has not specifically authorized the adoption of zoning ordinances that penetrate so deeply as this one does into the internal composition of a single housekeeping unit. Until it has done so, we are of the opinion that we should not read the general authority that it has delegated to extend so far. Such a reading would generate constitutional questions of the kind [unreasonable classification] suggested by the defendants, concerning which we express no opinion. (216 *N. E.* 2d at 120).[5]

In the course of the opinion comment was made on the Essex County Court opinion in *City of Newark v. Johnson,* 70 *N. J. Super.* 381 (1961). There the zoning ordinance similarly limited a "family" and single-family dwelling owners were convicted of ordinance violations because they had living within the homes unrelated children who were wards of the State Board of Child Welfare boarded with them by that agency. Justice Schaefer found the considerations advanced by the court to sustain the provision as not particularly persuasive. While we have similar doubts, we need express no definitive opinion because the factual situation there involved is now expressly covered by legislation.

---

[5]See also *Donadio v. Cunningham,* 58 *N. J.* 309, 326 (1971), footnote (8), as to what amounts to a land "use" regulatable within the contemplation of the zoning power.

*N. J. S. A.* 40:55–33.2 (*L.* 1962, *c.* 177) invalidates any zoning ordinance provision which discriminates between children who are members of a family by blood, marriage or adoption and foster children placed with such families by child care agencies. This enactment may be thought of as some indication of the legislative view that the zoning enabling act was not intended to confer power upon municipalities to limit a "family" to those biologically or legally related.[6]

■■ We prefer, however, to deal with the cases before us on the basis of unreasonableness and arbitrariness of these zoning provisions. It is elementary that substantive due process demands that zoning regulations, like all police power legislation, must be reasonably exercised — the regulation must not be unreasonable, arbitrary or capricious, the means selected must have a real and substantial relation to the object sought to be attained, and the regulation or proscription must be reasonably calculated to meet the evil and not exceed the public need or substantially affect uses which do not partake of the offensive character of those which cause the problem sought to be ameliorated. We think it clear that these "family" definitions and prohibitory ordinance provisions preclude so many harmless dwelling uses, as we have earlier pointed out by examples, in the effort to ban seasonal uses and rentals by unruly unrelated groups of young adults who indulge in anti-social behavior, that

---

[6]This same thought appears to run through the opinion of Judge G. H. Brown in *Marino v. Mayor and Council of Norwood,* 77 *N. J. Super.* 587 (Law Div. 1963). There the ordinance defined family as any number of individuals related by blood or marriage, living together as a single housekeeping unit. In a permanent, purely domestic situation, he said:

Until compelled to do so by a New Jersey precedent squarely in point, this court will not conclude that persons who have economic or other personal reasons for living together as a *bona fide* single housekeeping unit and who have no other orientation, commit a zoning violation, with possible penal consequences, just because they are not related. (77 *N. J. Super.* at 594).

they must be held to be so sweepingly excessive, and therefore legally unreasonable, that they must fall in their entirety. To use the phrase expressed by the Law Division in *Larson v. Mayor and Council of Borough of Spring Lake Heights*, 99 *N. J. Super.* 365, 374 (1968), in striking down similar provisions in a general police power ordinance (see footnote (1)), "* * * municipalities should not 'burn the house to roast the pig.' "

We fully concur in the reasoning and conclusions of Judge Conford in *Gabe Collins Realty, Inc. v. City of Margate City*, 112 *N. J. Super.* 341 (App. Div. 1970), which was held to be dispositive by the same court in *Schier*. While the zoning ordinance provision in *Gabe Collins*, aimed at the same evil, was more restrictive in some aspects and less in others than those in the cases at bar,[7] his concluding comments are, in our opinion, equally applicable here:

> Upon a consideration of all of the foregoing, it is our judgment that a general municipal restriction of occupancy of dwelling units to groups of persons all of whom are related to each other by blood, marriage or adoption is unreasonably restrictive of the ordinary and natural utility of such property as dwellings for people, and of the right of unrelated people in reasonable number to have recourse to common housekeeping facilities in circumstances free of detriment to the general health, safety and welfare. * * * Thus, even in the light of the legitimate concern of the municipality with the undesirable concomitants of group rentals experienced in Margate City, and of the presumption of validity of municipal ordinances, we are satisfied that the remedy here adopted constitutes a sweepingly excessive restriction of property rights as against the problem sought to be dealt with, and in legal contemplation deprives plaintiffs of their property without due process. (112 *N. J. Super.* at 349).

*Gabe Collins* is the only reported appellate decision we know of which deals with attempts to meet the type of sea-

---

[7]The Margate City ordinance defined "family" for purposes of dwelling use restriction as: "* * * one or more persons related by blood, marriage or adoption or not more than two unrelated persons occupying a dwelling unit as a single nonprofit houskeeping unit."

sonal group rental situation involved here. As we indicated
earlier, the evil arises because of the offensive *personal be-
havior* of many of these unrelated groups; group uses by
other unrelated segments of the summer resort population
present no problem. The practical difficulty of applying
land use regulation to prevent the evil is found in the seem-
ing inability to define the offending groups precisely enough
so as not to include innocuous groups within the prohibition.
Where that is possible in situations closest to those here
involved, as, for example, college fraternities and sororities,
such uses have generally been successfully barred from resi-
dential districts in college towns, on the basis that the fre-
quently boisterous and overexuberant conduct of their mem-
bers clashes with the general peace and good order usual
and expected in such zones. [*City of Long Beach v. Cali-*
*fornia Lambda Chapter of Sigma Alpha Epsilon Fraternity,*
255 *Cal. App. 2d* 789, 63 *Cal. Rptr.* 419 (1967); *City of*
*Schenectady v. Alumni Ass'n of Union Chapter, Delta Chi*
*Fraternity,* 5 *A. D. 2d* 14, 168 *N. Y. S. 2d* 754 (App. Div.
1957). Compare *City of Baltimore v. Poe,* 224 *Md.* 428,
168 *A. 2d* 193 (1961) (in which the court said the proper
remedy was not through zoning but by police action or in-
junctive relief.) See *Annot.,* "Application of Zoning Regu-
lations to College Fraternities or Sororities," 25 *A. L. R.
3d* 921 (1969).

 At oral argument counsel for the municipalities
asked for some guidance on how the problem might validly
be handled if we found the zoning ordinance provisions im-
proper. We are entirely sympathetic to the community de-
sire to prevent one segment of the summer population from
so adversely affecting other vacationers and permanent resi-
dents, as well as the municipality as a whole, by their
conduct. Ordinarily obnoxious personal behavior can best
be dealt with officially by vigorous and persistent enforce-
ment of general police power ordinances and criminal
statutes of the kind earlier referred to. Zoning ordinances
are not intended and cannot be expected to cure or prevent

most anti-social conduct in dwelling situations. When intensity of use, *i. e.*, overcrowding of dwelling units and facilities, is a factor in that conduct (as it well may be here on the theory that, pragmatically speaking, fewer people make less noise and disturbance), consideration might quite properly be given to zoning or housing code provisions, which would have to be of general application, limiting the number of occupants in reasonable relation to available sleeping and bathroom facilities or requiring a minimum amount of habitable floor area per occupant. The latter type of regulation was upheld in *Nolden v. East Cleveland City Comm'n,* 12 *Ohio Misc.* 205, 232 *N. E. 2d* 421 (C. P. Cuyahoga County 1966), on the basis that fire safety, health, crime prevention and maintenance of property, neighborhood and community — all matters of public welfare — are thereby served. See also *Haar,* Zoning for Minimum Standards: The Wayne Township Case, 66 *Harv. L. Rev.* 1051, 1061 (1953); *Haar,* Wayne Township: Zoning for Whom? — In Brief Reply, 67 *Harv. L. Rev.* 986, 989 (1954).

The judgment of the Law Division in A–135 is reversed and the cause is remanded to that court for the entry of a judgment consistent with this opinion. The judgment of the Appellate Division in A–140 is affirmed. No costs in either case.

*For reversal and remandment* in A–135—Chief Justice WEINTRAUB and Justices JACOBS, FRANCIS, PROCTOR, HALL and SCHETTINO—6.

*For affirmance*—None.

*For affirmance* in A–140—Chief Justice WEINTRAUB and Justices JACOBS, FRANCIS, PROCTOR, HALL and SCHETTINO—6.

*For reversal*—None.