234 N.J. Super. 619 (1989)
561 A.2d 319
NEW JERSEY SHORE BUILDERS ASSOCIATION, A NEW JERSEY NON-PROFIT CORPORATION, PLAINTIFF
v.
MAYOR AND TOWNSHIP COMMITTEE OF TOWNSHIP OF MIDDLETOWN, NEW JERSEY, DEFENDANTS.
Superior Court of New Jersey, Law Division Monmouth County.
Decided March 13, 1989.
*620 Steven M. Berlin, for plaintiff.
William F. Dowd, for defendants.
PESKOE, J.S.C.
In this action in lieu of prerogative writs, plaintiff attacks the validity of the Middletown Township moratorium ordinance adopted pursuant to N.J.S.A. 40:55D-90b. For reasons set forth below, this court concludes that the ordinance is invalid because it was based on a health officer's opinion that lacked the factual basis to demonstrate the existence of a "clear *621 imminent danger to the health of the inhabitants." No published opinion has yet addressed what constitutes the statutorily required demonstration that a municipality must consider. I hold that a moratorium ordinance is not tested by the usual standard applied to a municipal land use ordinance. Rather, the statute requires that municipal action have clear and specific factual support.
Plaintiff had filed an order to show cause in this matter. Plaintiff's standing to bring the suit has been determined. On the return date of the order, the hearing and trial of the in lieu of prerogative writs case proceeded together, by consent, on the record below.[1] Defendant's motion for summary judgment was addressed at the hearing as well. Defendant's motion is now denied. Plaintiff's requests for relief are granted.
Municipalities, generally, may exercise powers expressly granted to them and also powers necessarily or fairly implied by, or incidental to, the express grants. Inganamort v. Borough of Fort Lee, 62 N.J. 521 (1973). With respect to land use, in particular, a municipality, having no inherent power to legislate, may act only pursuant to a statutory grant of power. Lusardi v. Curtis Point Property Owners Ass'n, 86 N.J. 217 (1981); Dresner v. Carrara, 69 N.J. 237 (1976). A municipal legislative act is presumed valid and will be upheld unless, upon challenge, sufficient proof is shown to overcome the presumption. Kozesnik v. Montgomery Tp., 24 N.J. 154 (1957).
The Municipal Land Use Law (MLUL) governs land use in this State. It delegates to each municipality significant and specific powers to control the use of land within its boundaries. N.J.S.A. 40:55D-1 et seq. Among these is the power to impose a moratorium on all development. N.J.S.A. 40:55D-90b, effective March 21, 1986, sets forth the applicable standards. Prior *622 to the passage of this MLUL amendment, courts had disagreed about a municipality's power to enact moratoriums and, if there was such power, under what circumstances it could be exercised. N.J. Shore Builders Ass'n v. Dover Tp. Committee, 191 N.J. Super. 627 (Law Div. 1983). There is no longer any doubt about the power or the legislative intent strictly to limit the use of that power.
The power to impose any moratorium may be exercised only upon the determination that there exists "a clear imminent danger to the health of the inhabitants" and the moratorium may endure only for a maximum of six months. In exercising the moratorium power, the municipality is held to a strict necessity test that contrasts strikingly with the general judicial respect accorded municipal land use legislation. The usual test was set forth in Bow & Arrow Manor v. Town of West Orange, 63 N.J. 335, 343 (1973) and cited recently by the Appellate Division in Sporkin et al. v. Stafford Tp. et al., 227 N.J. Super. 569, 572 (App.Div. 1988) as follows:
It is not the function of the court to rewrite or annul a particular zoning scheme duly adopted by a governing body merely because the court would have done it differently or because the preponderance of the weight of the expert testimony adduced at a trial is at variance with the local legislative judgment. If the latter is at least debatable it is to be sustained. [At 572 citations omitted].
The statutory moratorium provision, itself, suggests that the terms of moratoriums may vary in that they might be shorter than six months. It may reasonably and fairly be inferred that the power may also be exercised less comprehensively, that is, as to less than all development. For example, once the threatened danger is identified, a moratorium designed to meet that danger may not, necessarily, require all development to cease. If its terms are rationally related to the danger addressed, a selective moratorium, limited to certain kinds of development, may be imposed as a proper exercise of municipal power.
Middletown enacted a moratorium applicable only to major site plan and subdivision applications on October 17, 1988. Applications for other development were not affected in any *623 way. The moratorium ordinance was introduced and had a first reading on July 25, 1988. At that time no qualified health officer had submitted a written (or any other) opinion that there existed a clear imminent danger to the inhabitants' health. Earlier that month some residents of Middletown had experienced low water pressure and at its July 18 meeting the township committee discussed the possibility of a building moratorium to alleviate water problems.
At the July 25 meeting the committee heard statements and answers to questions from William Pearce of the New Jersey American Water Co. and Howard Woods, Director of Planning of the American Water Works Service Company. They addressed the concerns of the committee regarding the water supply. The speakers stated that the water company supplies its customers with water at a "nominal capacity" of 46 million gallons a day and a high of 56 million gallons a day. Forty-two million gallons is the daily planned customers' level of use. Peak use is in the summer when the demand goes up to 50 million gallons a day. Pumping on a daily basis at a rate of 56 million gallons a day could not be sustained for a long period until May 1989 when capacity will increase by 10 million gallons a day. Another 10-million-gallon increase in capacity is planned later that year. The pumping capacity would continue to increase to 77 million gallons a day in 1993.
Rainfall early in 1988 had been lower than average. Very hot dry summer weather caused a sharp increase in demand. Woods emphasized that there had been repeated applications to build water towers and pumping stations and that such facilities were the best way to meet community water needs. Those applications had not been approved. Alternative plans now being implemented would meet all projected needs through 2000.
Public hearings on the ordinance continued at committee meetings on August 8, September 26, October 11 and October 17, 1988. On September 26, Lester Jargowsky, Monmouth *624 County health officer, and Kevin Toolan, an engineer with T & M Associates, Environmental Division, spoke. Jargowsky discussed the low reservior water level. He did not refer to the rate by which the reservoir waters are replenished, as had the water company representatives on July 25 who represented that the level was low, but not a drought condition. He listed uses that are affected by a water shortage and may then have health consequences or risk of epidemics, such as washing, cooking, use of home dialysis machines and general needs. Jargowsky said that there was no water shortage. But he also said there was an imminent health hazard. Toolan's view was that every new home necessarily draws from available water and aggravates the problem. He testified that new homes use more water than older ones in an effort to establish new lawns and landscaping. He testified that when Middletown residents were asked to decrease lawn watering during the 1988 summer, they did so and the problem was alleviated. His view was that the reservoir supply was the lowest that it had been for years, but that there was no drought. Toolan testified that the water problem resulted from an inadequate treatment plant and low treated water supply. Jargowsky ultimately sent the township committee a letter on October 17 referring to the township's seven-week supply of raw water and recommending a building moratorium.
The moratorium ordinance restricts planning board consideration of major subdivisions for six months. It expires in March 1989. The municipal governing body had been considering the moratorium since at least July 25, 1988 and had heard many statements from those attending the hearings prior to adoption of the ordinance. The information provided by the representatives of the water companies was to be considered, as was all other information bearing on the committee's concern, whether given under oath or not. N.J.S.A. 40:49-2b; Tomko v. Vissers, 21 N.J. 226 (1956). The water company speakers explained in detail the utility's planned augmentation of the pumping system. They explained carefully the status of the raw water *625 supply and the irrelevance of the reservoir level at that time to the problems experienced in Middletown. The relevant concern, in order to increase the water supply, was the pumping and treatment capacity of the system. They pointed out that the failure to approve requests to build pumping stations and water towers had led to the inadequacy of water pressure during peak demand periods in certain locations and from time to time otherwise. There was no raw water shortage in view of the rate by which the reservoirs are naturally replenished. In addition, several speakers referred to conservation techniques that were recommended by the water company but not acted upon by the committee.
The testimony of Jargowsky and Toolan was not inconsistent with the water company's. Jargowsky's October 17, 1988 letter to the Middletown Township Committee did not purport to refute the water company's statements. Yet, in it, he asserted that "there is approximately seven weeks of raw water remaining in the Swimming River Reservoir complex which truly represents an imminent public health hazard in accordance with the municipal land use law."
Plaintiff challenges Jargowsky's qualifications as a "qualified health professional" whose opinion that there is an imminent public health danger must form the basis for any moratorium. The statute does not define the requisite qualifications. This court accepts Jargowsky's doctorate in science, masters' degree in public health and health services administration and 15 years of experience with Monmouth County health offices as sufficient to qualify him to render opinions pursuant to N.J.S.A. 40:55D-90b.
It is important in noting whether his conclusion that an imminent hazard exists is supportable, that Jargowsky recommended that Middletown take two steps as follows:
"1. Activate a six-month moratorium on realty improvements that would put a burden on the water supply.
2. Activate a drought emergency plan and intensely police it through your local office of emergency management."
*626 The municipality has failed to indicate it has taken any action in accordance with Jargowsky's recommendation to implement a drought emergency plan. Further, the moratorium recommendation was as to "improvements that would put a burden on the water supply." As a practical matter, developments that were only at the site plan or subdivision stage would be most unlikely to burden the water supply within the six-month moratorium period. Clearly a moratorium alone would not suffice if there was a health emergency. Classification by the magnitude of the development (minor/major) might have validity with respect to some land use considerations, but so long as there were to be no restrictions on the number of minor subdivisions or site plans passed on by the local boards, there could be no assurance that, if the water supply was at imminent risk, the hazard would be averted by the moratorium chosen. Unlike the moratorium at issue in N.J. Shore Builders Ass'n v. Dover Tp., supra, Middletown's ordinance did not distinguish among kinds of uses. Nevertheless, the moratorium ordinance of October 17, 1988 was not reasonably designed to meet even the hazard described by Jargowsky.
The evidence provided by the water company officers was overwhelming that the emergency, if any, was not caused by a shortage of raw water but by an inadequate distribution system. The utility's capacity to pump water was shown to be sufficient to meet the usual level of demand and to meet increased seasonal demand on a short-term basis. If improvements underway were completed on schedule the capacity would soon be adequate for all purposes.
No evidence was presented to the Middletown governing body by fire protection experts or others qualified to evaluate the existence of dangers from inadequate fire protection. The complaints regarding low pressure in particular areas of the township were recurring and were not new, nor were they related to the level of raw water in reservoirs. Those complaints concerned mainly the areas long known to the water *627 company as requiring water towers or similar means to improve the condition.
There was no indication that businesses requiring abundant water were unable to operate. Voluntary conservation measures urged by the water company had apparently resulted in some thirsty lawns but no particular hazard otherwise. Those measures caused the water demand to drop sufficiently so that the water distribution system was no longer overburdened. No witness showed any facts from which the township committee reasonably could find that an imminent health hazard threatened Middletown Township.
The statute requires "a written opinion by a qualified health professional that a clear imminent danger to the health of the inhabitants of the municipality exists." It must be inferred that the Legislature intended that the opinion on which the municipality is to rely has an adequate and fully disclosed factual basis.
The statute requires the municipality to demonstrate on the basis of a health expert's opinion that a hazard exists. "Demonstrate" is not defined in the statute. The Random House Dictionary of the English Language (1967), unabridged, defines it as "to make evident or establish by arguments or reasoning; prove; to describe, explain or illustrate by examples, specimens, experiments or the like." No such demonstration occurred so as to warrant Middletown's moratorium. The recitation of findings incorporated in ordinance # 2061 refers to an exploration of less restrictive measures, but does not enumerate them. No evidence of such exploration was set forth at the hearings. The six findings of fact set forth are not supported by the record.
In deciding upon applications before them, municipal agencies usually are merely required to agree on resolutions that include findings of fact and conclusions based thereon. N.J.S.A. 40:55D-10(g). Boards of adjustment and planning boards are not admonished to demonstrate anything, as a general rule.
*628 N.J.S.A. 1:1-1 provides in part that "words and phrases shall be read and construed with their context...." A court should interpret legislation "consonant with the probable intent of the draftsman...." Matlack v. Burlington Cty. Board of Chosen Freeholders, 194 N.J. Super. 359 (App.Div. 1984). When standards are not expressed in a statute they may be reasonably inferred. In Re Application of the Burlington Cty. Board of Chosen Freeholders, 99 N.J. 90 (1985). "Statutes are to be read sensibly, the purpose and reason for the legislation controlling, rather than construed literally." Suter v. San Angelo Foundry and Machine Co., 81 N.J. 150, 160 (1979).
Clearly the Legislature did not regard a moratorium as a device to be utilized casually. There are only two provisions in the MLUL dealing with moratoriums. One forbids a municipality's utilization of a moratorium for the purpose of developing and adopting a master plan. The other permits a moratorium solely where the municipality demonstrates a clear imminent danger to the community and requires a health expert's written opinion as a basis for the demonstration.
The Legislature used the word "clear" as to the imminence of danger to be found by the municipality. The word does not appear anywhere else in the MLUL as a basis for decision. Although I am reluctant to enunciate a standard by which to measure the municipality's duty to weigh facts in relation to a legislative act in terms ordinarily relevant to a decision between adversaries, it appears that the Legislature intended that a clear and convincing need for a moratorium be shown before one is enacted.
It is evident that the Legislature intended to set a high standard for the showing that would justify a moratorium. This court infers that had the Legislature specifically addressed the issue, it would have required, at least, that the expert explain in full the reasons for the opinion and that the municipal governing body weigh available credible evidence and consider the adequacy of the reasons in light of all the circumstances *629 Had the municipality adhered to such a standard, it could not rationally and reasonably have enacted the moratorium ordinance on October 17, 1988.
In this case the court must decide whether the Middletown Township Committee made the requisite findings, based on credible information, justifying the conclusion that a moratorium was essential and, if any moratorium was justified, whether the method chosen was rationally related to the danger determined to be imminent. This court concludes that since the written opinion of the health officer submitted to the municipal governing body had inadequate support in the record, there had not been a demonstration of the necessary clear imminent danger. The municipal action imposing the moratorium was contrary to the statute and must be set aside. The concern of the court is not related to the duration of the moratorium as constituting an alleged taking. Schiavone Const. Co. v. Hackensack Meadowlands Development Commission, 98 N.J. 258 (1985). Although it is not necessary that I reach this issue, I deem it helpful to state that I conclude further, even if the moratorium had had an adequate statutory basis, its terms were not rationally designed to meet the hazard as defined.
This court attached little importance to the date of Jargowsky's letter. Had his testimony on September 26, 1988 been such as to justify the written opinion rendered thereafter, the statutory requirement would have been fulfilled.
Mr. Berlin may submit an appropriate order under the five-day rule.
NOTES
[1] A temporary restraining order entered previously permitted the municipal boards to process applications to which the moratorium applied, without taking final action.