799 A.2d 599 (2002)
352 N.J. Super. 1
REPAIR MASTER, INC. and Bruce Tyler, Plaintiffs-Respondents,
v.
BOROUGH OF PAULSBORO, Defendant-Appellant.
Gregory Rego and Theresa Rego, Plaintiff,
v.
Borough of Paulsboro, Defendant.
Superior Court of New Jersey, Appellate Division.
Argued May 8, 2002.
Decided June 3, 2002.
*600 Michael D. Varbalow, Cherry Hill, argued the cause for appellant (Dilworth Paxson and Angelini, Viniar & Freedman, attorneys; Mr. Varbalow, Penny Conly Ellison, Philadelphia, PA, James M. Carter, Somerville and Michael A. Angelini, Woodbury, on the brief).
William A. Thompson, III, argued the cause for respondent (Callaghan Thompson & Thompson, Atlantic City, attorneys; Mr. Thompson, Morristown, on the brief).
Before Judges KING, CUFF and WECKER.
The opinion of the court was delivered by KING, P.J.A.D.
This case involves the power of a municipality to place a moratorium on the issuance of licenses for residential rental properties. This moratorium is limited to single-family and non-owner-occupied duplex units. We conclude that the municipality has no power to regulate the nature of the occupancy of residential properties under either the general police power or the municipal land use regulatory power. The municipality's attempt to bar new tenancies in the Borough of Paulsboro for an indeterminate period is improper.

I
Paulsboro is located in Gloucester County on the Delaware River. The record reflects that in 2000 Paulsboro had a population of 6,160 people living in 2,353 households with an average household of 2.61 persons. Paulsboro has a high rate of renter-occupied housing units. Of the 2,353 occupied units in Paulsboro, 931 or 39.5% are renter-occupied, 16.9% higher than the national average. Paulsboro's per capita income for 2001 was estimated to be $13,992, 59.1% of the national average. The median household income in Paulsboro for 2001 was $29,412 or 65.3% of the national average. Paulboro's median household wealth was $68,871 for 2001, 73.5% of the national average.
On May 6, 1997 Paulsboro adopted Ordinance 02-997 authorizing licensing of residential real estate to insure "proper maintenance" and "to protect the lives and *601 property of the Borough residents." Paulsboro has made extensive efforts in recent years to bolster its owner-occupied housing stock and to encourage home-ownership, according to its counsel. This effort included cooperation with the federal Department of Housing and Urban Development and state, county, private sector and faith-based initiatives. These efforts look to the rehabilitation of vacant, abandoned and substandard housing for return to the market for home-ownership. We do not doubt the Borough's alleged laudable motives to revitalize its owner-occupied housing stock. The legality of the means is the novel question here.
The moratorium was prompted by the perception that the increased number of rental units had a negative effect upon the real estate market, drove up municipal operating costs, negatively impacted tax rates, and placed additional strain upon the school system. This perception inspired Paulsboro to explore the economic and social justification for a moratorium on the conversion of owner-occupied housing into rental units. Paulsboro commissioned TRIAD Associates, Renwick and Associates, and Ernest Swiger, Ph.D., to conduct a study to analyze the socio-economic impacts, fiscal impacts, real estate market effects, and tax base implications of the conversion of single family owner-occupied dwellings to renter-occupied units throughout the community.
In a letter dated July 16, 2001 Michael Zumpino, President of TRIAD Associates, stated "[a]s a result of our initial research, it is somewhat apparent that the continued conversion of single-family homes to rental properties does not appear to be in the best interest of maintaining a balanced inventory of owner and renter occupied housing units.... To the extent that the Study may find that the unmanaged proliferation of rental units, brought on by the continued conversion of owner-occupied single-family homes to rental units, is detrimental, it may be appropriate for the Borough to, at this time, delay action on any further requests for issuance of rental licenses until the Study is complete."
Based on these initial findings, the Borough Council later in 2001 enacted Resolution 160.01 (undated), the initial moratorium resolution. This resolution established a moratorium on the issuance of new rental licenses for single-family detached and single-family attached residences, and for "any other rental property not having one or more units occupied by the owner."
The TRIAD Study was completed in January of 2002. The study reached this conclusion:
[T]he proportion of renter- to owner-occupied-tenure in the borough's housing units is well beyond the threshold level for balanced, healthy neighborhoods consisting of single-family housing. This excessive presence of rental tenure throughout the municipality has adversely impacted the socio-economic fabric of the community in a variety of areas, including the housing market, the commercial real estate market, the municipal tax base, demand for police services, incidence of code enforcement violations, and increased presence of children-at-risk throughout the local school system.
The community has, thus, exceeded the point of "balanced housing" and now faces the challenge of re-establishing that balance to ameliorate some of the socio-economic maladies that grow out of it.
The TRIAD study recommended maintaining the moratorium on the conversion of owner-occupied rental units.
As discussed, information relating to real estate property values and transaction activity, code enforcement violations, *602 police calls for service, commercial ratable base development, and school services points to the conclusion that the ratio of renter-to-owner occupied housing in the borough, at four to six times the threshold level for healthy neighborhoods, is already too high to maintain stability throughout the borough. The range and weight of the evidence indicates that past and continued conversion to renter-occupied housing will be unhealthy for the borough, producing increased social costs in the form of decreases in real property values and market activity, increase in code enforcement violations and associated physical blight, increased demand for police services, and increased educational challenges for the school system. Specifically, we recommend the moratorium be maintained on each of the following rental unit types. Note that we would provide an exception only for the units within these classifications that contain the suffix O, i.e. those that are owner-occupied:
SFD (Single Family Detached)
SFA (Single Family Attached)
DPL (Duplex-2 units)
TPL (Triplex-3 units)
QD (Quad-4 units)
Following this recommendation, on February 5, 2002, the Borough Council adopted Resolution 53.02, the current moratorium, which maintained the ban on the issuance of new rental licenses, without an expiration date. The resolution states in pertinent part:
WHEREAS, the Borough of Paulsboro has enacted an ordinance governing the registration of rental properties and the issuance of licenses for the operation of such properties; and
WHEREAS, the Borough, in accordance with § 59B 10(B) of the Code of the Borough, may declare moratoria on the issuance of licenses of such classification or classifications of rental properties to ensure the health and welfare of the Borough and its residents; and
WHEREAS, the Borough commissioned a study of the effect of rental housing activities in the Borough; and
WHEREAS, the aforementioned study, conducted by Triad Associates in association with Renwick & Associates and Ernest Swiger, Ph.D., concludes that the proportion of the rental population has grown to a level that is imbalanced and unhealthy for the fabric of the community to the point of being severely adverse to the general welfare of the Borough and its residents;
NOW, THEREFORE, BE IT RESOLVED, by the Mayor and Borough Council of the Borough of Paulsboro, County of Gloucester and State of New Jersey, on this 5th day of February, 2002 that in order to impede the severely deleterious effects of the proliferation of rental properties in the Borough on the residents of the Borough as more specifically set forth in the Study of the Impact of the Rental Housing Industry in the Borough of Paulsboro, attached to this resolution, there is hereby maintained a moratorium on the issuance of any new license by the Borough for any rental property that would be classified under § 59B 4(I) as "SFD," "SFA," "DPL," "TPL," "QD," and "RH" [Rooming House]. Based upon the findings of the aforementioned study, there shall be no limit on the issuance of licenses under Chapter 59B of the Borough Code for rental properties as follows: (a) these that would be classified as "CPL;" [Complex5 or more units] (b) for such properties that would be classified as "CM" [Commercialunit is located in a commercial business structure] and that contain a viable commercial entity; and
*603 (c) any classification, including those set forth above, with an "O" suffix; provided, however, that the owner occupy the property as his, her or their primary residence.
Plaintiff Repair Master is the owner of five rental units in Paulsboro. Repair Master applied for rental licences and was refused. Its counsel wrote to the Borough solicitor requesting the issuance of rental licenses for the five properties but was informed that the moratorium would remain in place and no rental licenses would be issued for any new rental properties. Repair Master then sued to void the moratorium and compel Paulsboro to issue these rental licenses.
In his April 2, 2002 oral opinion, Judge Rafferty ruled against the validity of the moratorium, stating:
From a practical analysis, this moratorium would prohibit a property owner from renting a vacant single-family dwelling to anyone. It is a stretch of logic to make the conclusion that a particular rental property would contribute to social problems which the municipality is attempting to address. The moratorium, read in conjunction with the TRIAD report, would base its conclusion and its effect on the presupposition that all people who rent property present socio-economic problems. To take the TRIAD report a step further, it would seem that they conclude the children of people who rent property, that those children present special educational problems.
Without addressing the validity of the licensing ordinance, this Court comes to the legal conclusion, based on an objective review of all of the facts and legal arguments of counsel, that this moratorium is arbitrary, unreasonable, and does not address appropriately the legitimate concern of the municipality. This Court makes this finding understanding the [pres]umption of the validity of the municipal action.
The judge reserved the plaintiffs' claims for damages for a future plenary hearing. We granted leave to appeal on April 4, 2002 and accelerated the matter because of the public interest.

II
Plaintiffs do not attack the Borough's authority to license rental housing for general public health, safety and welfare purposes under the general police power. This authority to license was conceded by plaintiffs in the Chancery Division. See generally Wildwood Storage Center, Inc. v. Mayor and Council of the City of Wildwood, 260 N.J.Super. 464, 616 A.2d 1331 (App.Div.1992).
Plaintiffs do attack the Borough's authority to refuse licenses for rental housing and, in effect, to control the demographics of the community and prevent further occupancy of single-family and non-owner occupied duplexes by tenants for an unspecified period. Paulsboro asserts that the power to enact a moratorium against new tenants derives from "the statutory authority to enact ordinances for the health, safety and welfare of the community of and its inhabitants." The Borough relies on N.J.S.A. 40:48-2 which states in full:
Any municipality may make, amend, repeal and enforce such other ordinances, regulations, rules and by-laws not contrary to the laws of this state or of the United States, as it may deem necessary and proper for the good government, order and protection of persons and property, and for the preservation of the public health, safety and welfare of the municipality and its inhabitants, and as may be necessary to carry into effect the *604 powers and duties conferred and imposed by this subtitle, or by any law.
The Borough augments its "home rule" contention by reliance on Article 4, § 7, paragraph 11 of the State Constitution which states in pertinent part:
The provisions of this Constitution and of any law concerning municipal corporations formed for local government ... shall be liberally construed in their favor. The powers of ... such municipal corporations shall include not only those granted in express terms but also those of necessary or fair implication, or incident to the powers expressly conferred, or essential thereto, and not inconsistent with or prohibited by this Constitution or by law.
In reviewing any local action, we start with the basic premise that a municipal corporation may exercise only the power conferred on it by the Legislature. N.J.S.A. 40:48-2, should be understood as the legislative implementation of this authority. See 515 Associates v. City of Newark, 132 N.J. 180, 623 A.2d 1366 (1993). Neither the constitutional nor the statutory provision is a blanket authorization to pursue the governing body's particularized notion of the public good or to legislate beyond the bestowed powers, express or implied. See Hudson Circle Servicenter, Inc. v. Kearny, 70 N.J. 289, 301, 359 A.2d 862 (1976). Where there is a potential or actual conflict, the definition of public interest is best left to the State, as the higher level of government. See Meridian Hospitals v. Point Pleasant, 325 N.J.Super. 490, 503-04, 739 A.2d 999 (App. Div.1999); Michael A. Pane, 34 New Jersey Practice, Local Government Law § 2.18 at 42-43 (1999).
Paulsboro relies, in part, on Dome Realty Inc. v. Paterson, 83 N.J. 212, 416 A.2d 334 (1980), as supportive of its ability to regulate the status of occupants of residential housing. There the Court recognized that the "Legislature resolved beyond question whether municipalities have the authority to require substantial compliance with local housing codes before a new tenant may take possession of residential dwellings." Id. at 227, 416 A.2d 334; N.J.S.A. 40:48-2.12m; L. 1979, c. 476, effective February 27, 1980. This "new enactment grants to municipalities the power to prohibit new rentals of residential dwellings except where an official inspection determines that the unit meets existing standards of safety and habitability." Id. at 228, 416 A.2d 334. We do not construe this as a broader authority to regulate the nature and character of occupants, i.e., owners or tenants, a subject concerning the demographic make-up of the community, not the health and safety of the occupants, or the physical integrity of the housing unit.
N.J.S.A. 40:48-1 sets forth 31 areas in which express powers are granted; none are granted for the prohibition on rental of real property for social reasons. The Borough provides us with an illustrative litany of judicially-approved municipal regulatory ordinances based on the exercise of implied power, not expressly granted by any enabling act. These include, as listed by the Borough:
1. Regulating the hours of operation of retail establishments of any nature other than pharmacies or restaurants, Quick Chek Food Stores v. Township of Springfield, 83 N.J. 438, 416 A.2d 840 (1980), citing N.J.S.A. 40:48-2 and New Jersey Constitution Article 4, § 7, paragraph 11;
2. Regulating the acceptance of dedicated streets [decided prior to the Municipal Land Use Law, N.J.S.A. 40:55D-1 to -136], Kligman v. Lautman, 98 N.J.Super. 344, 237
*605 A.2d 483 (App.Div.1967), aff'd, 53 N.J. 517, 251 A.2d 745 (1969);
3. Regulating quarries, Bernardsville Quarry, Inc. v. Borough of Bernardsville 129 N.J. 221, 608 A.2d 1377 (1992);
4. Barring cigarette vending machines, C.I.C. Corp. v. Township of East Brunswick, 266 N.J.Super. 1, 628 A.2d 753 (App.Div.1993), aff'd, 135 N.J. 121, 638 A.2d 812 (1994);
5. Requiring owners of large multiple dwellings to provide armed security guards, 515 Associates v. City of Newark, 132 N.J. 180, 623 A.2d 1366 (1993);
6. Regulating soil removal, Fred v. Mayor and Council of Borough of Old Tappan, 10 N.J. 515, 92 A.2d 473 (1952);
7. Regulating public amusement and games, Bonito v. Mayor and Council of Bloomfield Township, 197 N.J.Super. 390, 484 A.2d 1319 (Law Div.1984);
8. Preserving trees and shrubs, Sheerr v. Evesham Township, 184 N.J.Super. 11, 445 A.2d 46 (Law Div.1982);
9. Disposing of dead animals, Schwarz Bros. v. Board of Health of Jersey City, 84 N.J.L. 795 (Sup.Ct.1913);
10. Prescribing degree and times for provision of heat to tenants, State v. Kiejdan, 181 N.J.Super. 254, 437 A.2d 324 (App.Div.1981);
11. Barring obscenity and lewdness, Expo, Inc. v. City of Passaic, 149 N.J.Super. 416, 373 A.2d 1045 (Law Div.1977); see also Adams Newark Theatre Co. v. City of Newark, 22 N.J. 472, 126 A.2d 340 (1956), aff'd, 354 U.S. 931, 77 S.Ct. 1395, 1 L.Ed.2d 1533 (1957); rehearing denied, 355 U.S. 851, 78 S.Ct. 8, 2 L.Ed.2d 61 (1957);
12. Controlling pollution, Board of Health of Weehawken Township v. New York Central Railroad, 10 N.J. 294, 90 A.2d 729 (1952);
13. Collecting and removing garbage, Pleasure Bay Apartments v. City of Long Branch, 66 N.J. 79, 328 A.2d 593 (1974);
14. Assisting seniors citizens, Property Owners Association of North Bergen v. North Bergen Township, 74 N.J. 327, 378 A.2d 25 (1977);
15. Requiring registration of canvassers and solicitors, Hynes v. Mayor and Council of Borough of Oradell, 425 U.S. 610, 96 S.Ct. 1755, 48 L.Ed.2d 243 (1976);
16. Regulating automobile sales lots, Raritan Township v. Hubb Motors, Inc., 26 N.J.Super. 409, 98 A.2d 326 (App.Div.1953);
17. Regulating food packaging, Gold v. City of Council of City of Trenton, 121 N.J.Super. 137, 296 A.2d 327 (App.Div.1972);
18. Regulating hours of business operation, Southland Corp. v. Edison Township, 217 N.J.Super. 158, 524 A.2d 1336 (L. & Ch. Div.1986), aff'd, 220 N.J.Super. 294, 531 A.2d 1361 (App.Div.1987); Quick Chek Food Stores, supra, and Dock Watch Hollow Quarry Pit, Inc. v. Warren Township, 142 N.J.Super. 103, 361 A.2d 12 (App.Div.1976), aff'd, 74 N.J. 312, 377 A.2d 1201 (1977);
19. Regulating Sunday sales and activities, Dock Watch Hollow Quarry Pit, supra, and Masters Jersey, Inc. v. Mayor and General Council of Borough of Paramus, 32 N.J. 296, 160 A.2d 841 (1960);
20. Regulating laundromats, Little Falls Township v. Husni, 139
*606 N.J.Super. 74, 352 A.2d 595 (App. Div.1976);
21. Regulating peddler's carts, Brown v. City of Newark, 202 N.J.Super. 1, 493 A.2d 1255 (App.Div.1985), aff'd in part, reversed in part on other grounds, 113 N.J. 565, 552 A.2d 125 (1989); and
22. Imposing fees for interments in cemeteries, City of Clifton v. East Ridgelawn Cemetery, 122 N.J.L. 115, 4 A.2d 79 (N.J. E. & A.1939).
This presumably non-exhaustive list of implied powers for municipal regulation is impressive but not persuasive in the Borough's favor. It does not suggest the power to ban a class of housing occupants or deny an owner a substantial attribute of ownership and possession of real estate.
Municipal attempts to regulate the nature of the occupancy of real property have not fared well in our courts, presumably because of a lack of authorization by statute. The Borough's argument that the New Jersey courts have recognized in years past the right of municipalities to enact moratoria that restrict certain uses of the land completely misses the mark. Paulsboro's moratorium does not constitute an attempt to regulate the physical use of property but is an attempt to regulate the attributes of ownership and the nature of the occupancy of the property. See William M. Cox, New Jersey Zoning and Land Use Administration § 34-8.7 at 712-13 (2002).
In Kirsch Holding Co. v. Borough of Manasquan, 59 N.J. 241, 281 A.2d 513 (1971), the Court considered the validity of zoning ordinance provisions prohibiting "group rentals" or seasonal shore rentals, the so-called "animal house" cases.
It is elementary that substantive due process demands that zoning regulations, like all police power legislation, must be reasonably exercisedthe regulation must not be unreasonable, arbitrary or capricious, the means selected must have a real and substantial relation to the object sought to be obtained, and the regulation or proscription must be reasonably calculated to meet the evil and not exceed the public need or substantially affect uses which do not partake of the offensive character of those which cause the problem sought to be ameliorated.
[Id. at 251, 281 A.2d 513.]
The Court articulated the pitfalls of attempting to cure social problems with land use regulations; "[t]he practical difficulty of applying land use regulation to prevent the evil is found in the seeming inability to define the offending groups precisely enough so as not to include innocuous groups within the prohibition." Id. at 253, 281 A.2d 513. "Zoning ordinances are not intended and cannot be expected to cure or prevent most anti-social conduct in dwelling situations." Id. at 253-54, 281 A.2d 513. The Court held that the zoning ordinance provisions were "so sweepingly excessive, and therefore legally unreasonable, that they must fall in their entirety." Id. at 252, 281 A.2d 513. In the present case, Paulsboro has attempted to utilize its "health, safety and public welfare" licensing ordinance to cure its perceived socio-economic problems, an impermissible arrogation of governmental power.
In Urban v. Planning Board, 124 N.J. 651, 662, 592 A.2d 240 (1991), the Court criticized the Planning Board's denial of subdivision applications because of the potential for absentee ownership of the lots. The Supreme Court pointedly stated:
In this case we believe that the Planning Board was moved in part by inappropriate factors, such as the possibility that subdivided lots would be held by absentee owners, thus exacerbating a *607 problem of municipal regulation of summer rentals. We have repeatedly emphasized that the answer to such problems lies not in the zoning power but in the police power to insist on strict compliance with all other regulations. See State v. Baker, 81 N.J. 99, 405 A.2d 368 (1979) (socially disruptive behavior best regulated through use of general police power); Kirsch Holding Co. v. Borough of Manasquan, supra, 59 N.J. at 253-54, 281 A.2d 513 (same). The minutes of the Planning Board meeting showed clearly that it was motivated, at least in part, by the nature of the proposed ownership, with one Board member saying, "one of the problems we have with absentee landlords is the fact that when we try to take some sort of action against the owner of the property, a couple [of problems] come up." That is clearly an inappropriate factor that undercuts the presumptive correctness of the Planning Board's decision.
[Id. at 662-63, 592 A.2d 240.]
Other pertinent examples include Borough of Glassboro v. Vallorosi, 117 N.J. 421, 568 A.2d 888 (1990) (municipality may not adopt zoning regulations that unreasonably distinguish between unrelated and related persons in residential occupancy) (cited by Urban v. Planning Board, 124 N.J. at 662, 592 A.2d 240); Cherry Hill Township v. Oxford House, 263 N.J.Super. 25, 621 A.2d 952 (App.Div.1993) (residence for recovering alcohol and drug dependent persons not a zoning violation simply because occupants unrelated).
The Municipal Land Use Law, N.J.S.A. 40:55D-1 to -136, "allows for municipal regulation of the uses of land only, not regulation of who may own land or what legal form that ownership or other possessory interest may take." Cox, § 34-8.7 at 712 (2002). In ML Plainsboro Ltd. Partnership v. Plainsboro, 316 N.J.Super. 200, 205-06, 719 A.2d 1285 (App.Div.1998), we ruled that the owner of a conference center and hotel complex was not subject to municipal control as to the form of ownership, so long as the permitted use was maintained. The municipality could not insist that there be only a single user and that the property be maintained as an owner-occupied campus. The owners had a legal right to sell without municipal approval, if the zoning use was not altered.
In Bridge Park Co. v. Borough of Highland Park, 113 N.J.Super. 219, 273 A.2d 397 (App.Div.1971), we considered a municipal attempt to limit condominium development. We held that a zoning ordinance which restricted ownership of a twelve-unit building to a single entity was void as a regulation of ownership of buildings or types of tenancies allowed. In Arkam Machine & Tool Co. v. Lyndhurst, 73 N.J.Super. 528, 533 (App.Div. 1962), we held that the number of tenants who would be involved in the commercial use did not affect the continuing right to operate; this was an issue of ownership or tenancy, not land "use." Id. See also AT & T Comm. v. Bedminster Adj. Bd., 216 N.J.Super. 340, 345, 523 A.2d 709 (Law Div.1986); Tp. of Washington v. Cent. Bergen Comm. Health, 156 N.J.Super. 388, 417, 383 A.2d 1194 (Law Div.1978).
Restrictions on types of occupancy may also create equal protection issues, which in the past, "have been raised most notably by municipal efforts to exclude low and moderate income people from communities...." Cox, at § 35.4 at 737 (2002) (citing So. Burlington Cty. N.A.A.C.P. v. Tp. of Mt. Laurel, 67 N.J. 151, 336 A.2d 713 (1975) (Mount Laurel I); So. Burlington Cty. N.A.A.C.P. v. Mount Laurel Tp., 92 N.J. 158, 456 A.2d 390 (1983) (Mount Laurel II); and remarking on "the Court's negative response to these efforts.") Incidentally, *608 Paulsboro currently meets its affordable housing obligation under the Mount Laurel cases. We can only speculate on what impact a rental moratorium would have on this policy.
Moreover, municipal moratoria are generally disfavored by our law as a means of either controlling land use or the nature of occupancy. N.J.S.A. 40:55D-90 of the MLUL contains the only two sections in that statute which address municipal moratoria. Subsection (a) declares that "the prohibition of development in order to prepare a master plan and development regulations is prohibited." Cox, § 34-8.5 at 708 (2002), observes that the statute has been in effect for twenty-seven years "and the provisions are so unequivocal that municipalities have ceased to enact the type of moratoria proscribed by subsection (a)." Subsection (b) permits moratoria only "where the municipality demonstrates on the basis of a written opinion by a qualified health professional that a clear imminent danger to the health of inhabitants of the municipality exists...." In such a case, the moratorium cannot exceed six months. See N.J. Shore Builders v. Mayor, 234 N.J.Super. 619, 561 A.2d 319 (Law Div. 1989). Limited sewer capacity, however, may justify a municipal moratorium on sewer connections, where all property owners "knew of the limited supply of existing permits" and "the playing field was level." First Peoples Bank v. Medford Tp., 126 N.J. 413, 420, 599 A.2d 1248 (1991). Of course, there are no extant moratorium provisions in the MLUL allowing a municipality to order a rental standstill in order to alter the mix of owner-occupied and tenant-occupied houses.
We conclude that the Legislature did not imply the power to municipalities to deny or regulate a property owner's right to rent non-owner occupied residential housing in an effort to alter the community's dynamics and demographics, and control the ratio of owners and tenants. This is a power we simply will not infer in light of the evidence and the history of our land use and occupancy jurisprudence. If this power is conferred on municipalities, we think it should be the result of legislative deliberation and evaluation of all the complex considerations, not from a judicially-created attempt to accommodate a single, though doubtlessly sincere, municipal effort. The problem could be compounded if other municipalities were to take this route and seek an arguably more desirable occupancy mix. Specific legislative approval should be a precondition to the exercise of a power we consider a radical regulatory development.
Affirmed.