263 N.J. Super. 25 (1993)
621 A.2d 952
CHERRY HILL TOWNSHIP, PLAINTIFF-RESPONDENT,
v.
OXFORD HOUSE, INC., DEFENDANT-APPELLANT, AND PARVIZ AND MARJAN GHASSEMI, H/W, THOMAS AND PATRICIA MCARDLE, H/W, AND JOHN DOE AND JANE DOE, (TENANTS), J/S/A DEFENDANTS.
Superior Court of New Jersey, Appellate Division.
Argued December 9, 1992.
Decided February 18, 1993.
*30 Before Judges KING, LANDAU and THOMAS.
James Katz, American Civil Liberties Union, argued the cause for appellant (Tomar, Simonoff, Adourian & O'Brien, attorney).
Francine I. Axelrad, argued the cause for respondent.
The opinion of the court was delivered by KING, P.J.A.D.
On this appeal we consider whether two groups of recovering alcohol and substance abusers have a right to live together in single-family residences in Cherry Hill Township, a suburban community of 70,000 residents. These recovering former substance abusers comprise two of about twenty "Oxford Houses" now established in New Jersey. The Chancery Division judge held that the Cherry Hill Oxford House residents do not satisfy the definition of a "family" contained in Cherry Hill's zoning ordinance and ordered the residents out of the two homes. The judge also held that these residents, as recovering former substance abusers, were not protected by the Federal Fair Housing Act. 42 U.S.C.A. §§ 3604-3631. We reverse the eviction order and hold that Cherry Hill's current definition of "family" violates the New Jersey Constitution. We also hold that these residents have presented a sound legal claim for protection under the Federal Fair Housing Act.

I
Oxford House, Inc., a nonprofit organization, assists in establishing independent, self-supporting, self-governing homes where persons recovering from alcohol and drug addiction can live together and provide each other with mutual support and encouragement. All Oxford Houses, to conform to the organization's *31 guidelines, must be financially self-supported, run democratically, and the residents must immediately expel any resident who relapses into drug or alcohol use. All Oxford Houses are leased, not purchased, and have no exterior characteristics which distinguish them from other residences in their neighborhoods. The first Oxford House was opened in Maryland in 1975. Between 1975 and 1988 over twenty Oxford Houses were successfully established in the Washington, D.C. area.
In 1988 Congress passed the Federal Anti-Drug Abuse Act. 42 U.S.C.A. §§ 300x to 300x-13. As part of this act, and based in part on the Oxford House concept, every state, in order to receive certain federal funding for alcohol and substance abuse services, is required to establish a revolving fund to make start-up loans to recovering individuals for group homes which are alcohol and drug free. 42 U.S.C.A. § 300x-4a; 54 Fed.Reg. 15808 (1989) (advisory guidelines for administration of the program). The extant legislative history regarding this portion of the Anti-Drug Abuse Act speaks most favorably of the Oxford House program. 134 Cong.Rec. E3732-02 ("Self-run and self-supported addiction recovery houses  such as Oxford House  hold out great promise as a cost-effective way to help addicted individuals who want to recover.").
Pursuant to the Anti-Drug Abuse Act, groups of four or more recovering alcohol or substance abusers may apply for a loan of up to $4,000 to cover the start-up costs of renting a house, including the security deposit and first month's rent. This loan must be repaid within two years. Any program established under the act must follow four rules: (1) the use of alcohol or drugs must be prohibited, (2) any resident who violates this prohibition must be expelled, (3) the cost of housing must be paid by the residents, and (4) the house must be run in a democratic manner. 42 U.S.C.A. § 300x-4a(a)(6). The program has been quite successful  over 400 Oxford Houses have been established nation-wide.
*32 In New Jersey, a $100,000 revolving fund is administered by the Department of Health, Division of Alcoholism and Drug Abuse. On September 9, 1988 Oxford House entered into a contract with the State of New Jersey to assist residents in local communities in developing these households for recovering alcoholics and drug addicts. Oxford House attempts to locate homes in quiet single-family neighborhoods away from the temptations of bars and drug-trafficking. Homes are set up by an outreach representative of Oxford House who lives in the house for two or three months, attends weekly house meetings, and assists in filling vacancies in the house. There is no house manager or supervisor, because, according to Joseph Lucarine, a New Jersey Department of Health, Division of Alcoholism and Drug Abuse program development specialist, "Oxford House is not a substance abuse treatment program.... [It] is simply a post-treatment, self-governing place of residence for persons well along in the recovery process, but still in need of a place to live."
Once a residence is formed under the Oxford House model and principles, it operates in accordance with rules established by the residents of the house. Some of the more common rules include:
a. Each house is to have an elected officer whose term shall not exceed six months.
b. All decisions are by majority vote.
c. Weekly meetings of the residents are required.
d. New residents must be approved by 80% of the existing residents. To become a resident a written application must be filed.
e. Each resident is to contribute toward the operating costs of the house.
f. All residents prepare their own main meals.
These rules and others have been stressed as the underpinnings of the Oxford House system which unites the residents as part of their particular community. All residents have access to the entire house and share in many common activities. So long as the residents remain alcohol and drug free and continue to pay their share of household expenses, they may remain at the house indefinitely. The typical turnover rate of the residents *33 at Oxford Houses varies. The turnover tends to be higher when a home is first formed because few of the initial residents know each other. As some of these residents move on, the new residents tend to become friends of longer-term residents and the turnover rate becomes lower.

II
In April, 1990 an Oxford House was established at 141 Pine Valley Road in Cherry Hill. In May, 1990 an Oxford House was established at 108 Hilltop Court in Cherry Hill. Both are in single-family residential zones. The use of these premises began upon the execution of residential leases with the owners of each property. The owners do not live in the houses. Oxford House, Inc., approved each of these houses for a State of New Jersey revolving loan to cover start-up costs in the amount of $4,000.
On June 12, 1990, over two and one-half years ago, the Township of Cherry Hill filed this complaint in the Chancery Division of the Superior Court against Oxford House, unnamed occupants residing at 108 Hilltop Court and 141 Pine Valley Road, and the owners of the houses. The Township alleged that the properties were occupied in violation of: (1) Cherry Hill Township Ordinance 75-11 which requires the owners of rental property to obtain a certificate of occupancy; (2) Cherry Hill Township Ordinance 76-71 which restricts the use of the properties to single families; (3) N.J.S.A. 40:55D-1 to -129, the Municipal Land Use Law (MLUL), which requires a use variance if the properties were not being used as a residence; and (4) N.J.S.A. 2C:35-7, the "drug free school zone" law which enhances the criminal penalties for distribution of narcotics within 1,000 feet of a school. Cherry Hill Ordinance 76-71 defines a "family" as:
a single individual, doing his own cooking, and living upon the premises as a separate housekeeping unit, or a collective body of persons doing their own cooking and living together upon the premises as a separate housekeeping unit *34 in a domestic relationship based upon birth, marriage or other domestic bond. [Emphasis added.]
The Township sought both temporary and permanent injunctions forcing the occupants to vacate the properties until they obtained a use variance and a certificate of occupancy under the Township's zoning ordinances.
On June 13, 1990 a Chancery Division judge refused to enter a temporary injunction and ordered the defendants to apply for a certificate of occupancy. The judge also ordered the Township to conduct a municipal inspection of the properties and report its findings to the court.
Later on that same day, June 13, 1990, the occupants complied with the court order and filed the applications for certificate of occupancy. The next day the Property Maintenance Inspector and Fire Subcode Official inspected the properties and concluded that there was a change in use under the BOCA National Building Code, as incorporated by the New Jersey Uniform Construction Code, N.J.A.C. 5:23-1.1 to -12.8, from an R-3 single-family residential use to an I-1 institutional use. Under this new use, the properties required an automatic fire alarm system and specialized emergency exits for continued legal occupancy.
On June 15, 1990 the Subcode Official posted a Notice of Imminent Hazard and Notice and Order of Penalty on both premises, requiring immediate evacuation and assessing a weekly fine. This decision was appealable to the Camden County Construction Board of Appeals. Simultaneously, the Township filed an amended complaint asserting the BOCA Code violations and requested that the premises be immediately vacated. On June 22, 1990 the Chancery Division judge ordered: (1) that officials of the Township be restrained from any further efforts at compelling removal of the occupants from the premises until further order of the court, (2) that all appeals to the Camden County Construction Board of Appeals be stayed, (3) that the Township was not enjoined from citing defendants *35 for continuing violations of the BOCA Code, and (4) that all claims be heard in the Chancery Division.
Oxford House filed its answer and a counterclaim alleging that the Township's zoning ordinances, on their face and as applied, were both unconstitutional and violated the Federal Fair Housing Act. Oxford House then moved for summary judgment on its counterclaim. Oxford House relied on an expert report from Richard Cohen, a professional planner, who concluded that the use of the properties was consistent with the requirement for single family use under the Township's zoning code. The Township relied on a report from Mary Winder, also a professional planner, who concluded that the properties were being used as rooming houses, a use not permitted under the Township's Zoning Code.
Oxford House also relied upon a July 31, 1990 written opinion issued by John T. Monahan, Assistant Director, Licensing and Inspections of the New Jersey Department of Community Affairs, at the request of Oxford House's counsel, that the Cherry Hill houses did not constitute boarding or rooming homes under State law (N.J.S.A. 55:13B-3). In September of 1990 both Oxford House residences passed reinspection in connection with the Township's certificate of occupancy ordinance. The houses are currently in full compliance with the Township's property maintenance code as of the time of oral argument insofar as both counsel were aware.
On a number of occasions prior to August 1991, the hearings on the Township's application for a preliminary injunction were postponed or canceled by agreement. The original Chancery Division judge retired and the matter was transferred to his successor. On August 14, 1991 the new Chancery Division judge heard oral argument on the Township's motion for a preliminary injunction and Oxford House's motion for summary judgment. An agreement was reached between both counsel, not as a result of any request by the judge, that the motions be decided upon the submissions then before the court with no *36 presentation of live testimony, even though the judge offered the parties an opportunity to present evidence at the time the case was submitted in August 1991.
On April 27, 1992 the Chancery judge issued his ruling in favor of the Township. His decision was based in part on deposition testimony from June and July of 1990, as well as an August 1991 submission of affidavits by Oxford House. The Chancery judge found that: (1) the occupants of the two homes did not constitute a family, (2) the occupants were not "handicapped" as defined by the Federal Fair Housing Act, and (3) the Township did not attempt to enforce its laws selectively or in a discriminatory fashion. He denied Oxford House's motion for summary judgment and the Township's application for fines. He ordered the occupants to vacate the premises within 60 days.
The Chancery judge's opinion also provided that if Oxford House contended that evidence discovered subsequent to the closing of the record showed that the homes met the requirements of law, Oxford House should submit an application to the Township for a certificate of occupancy within 60 days; otherwise, it should apply for a use variance within 60 days and make an application for a stay of the eviction order. On May 1, 1992 Oxford House filed a motion for reconsideration, or in the alternative, to supplement the record to provide testimony regarding the current use of the premises by the present residents. On May 15, 1992 the Chancery judge denied this motion.
On May 26, 1992 Oxford House filed a motion with this court for leave to appeal and for emergency relief, and for a stay of the Chancery judge's April 28, 1992 eviction order. On May 29, 1992 we granted the motion for leave to appeal and stayed the Chancery judge's order of eviction. This stay was conditioned "on the obligation of [Oxford House] to apply [promptly] to the Zoning Board for interpretative relief, and, if necessary, for appropriate zoning relief under the MLUL, N.J.S.A. 40:55D-70(b) *37 pending resolution of this appeal...." During June 1992, Oxford House applied to the Cherry Hill Zoning Board for an interpretative ruling that the premises at 141 Pine Valley Road and 108 Hilltop Court be considered single-family residences under the Township's zoning ordinance.
On November 19, 1992 the Cherry Hill Zoning Board heard evidence and argument regarding whether Oxford House residents qualified as a "family" under the zoning ordinance. One resident from each of the two homes testified at the zoning board hearing. These residents gave compelling testimony to the Zoning Board regarding the residents' endeavors to remain drug and alcohol free. The residents clearly believed that they would not be able to remain clean and sober without the support of their fellow residents at Oxford House. Most of the residents of both houses were from Cherry Hill or surrounding communities. In one house, more than half the residents were graduates of Cherry Hill high schools.
On November 20, 1992 the Zoning Board ruled, 4-3, that the Oxford House residents do not constitute a "family" as defined by the Township's zoning ordinance  "a collective body of persons ... in a domestic relationship based upon birth, marriage or other domestic bond." Three weeks after the 4-3 interpretation against Oxford House by the Zoning Board, we heard oral argument in this case on an accelerated basis because of the public interest. R. 1:2-5(1); R. 2:9-2.

III
Before we address the merits of this case, we briefly discuss the three reported federal cases regarding Oxford Houses in New Jersey.

Plainfield
In Oxford House-Evergreen v. City of Plainfield, 769 F. Supp. 1329 (D.N.J. 1991) (Plainfield), the City of Plainfield had filed an action in State court seeking to enjoin Oxford *38 House's use of a residential property. The Plainfield zoning ordinance defined "family" as "one (1) or more persons living together as a single non-profit housekeeping unit whose relationship is of a permanent and domestic character, as distinguished from fraternities, sororities, societies, clubs, associations.... All commercial residences, non-familiar institutional uses, boarding homes and other such occupancies shall be excluded from one-family zones." Id. at 1333. The Plainfield Zoning Board concluded that the Oxford House residents were not "permanent" or "domestic," because of their transiency and lack of "intimacy."
Oxford House filed a complaint in Federal District Court alleging a violation of the Federal Fair Housing Act and seeking a preliminary injunction. Judge Sarokin analyzed the Federal Fair Housing Act, as amended in 1988, stating: "The legislative history of the act's amendments indicates that recovering alcoholics and addicts were meant to be included in the definition." Id. at 1342; see also H.R.Rep. 711, 100 Cong.2d Sess. 22 (1988), 1988 U.S.C.C.A.N. 2173, 2183; 24 C.F.R. §§ 100-201(a)(2) (1989). The Act clearly does not include "current, illegal use of or addiction to a controlled substance" within its purview. 42 U.S.C.A. § 3602(h). The distinction is critical.
The City of Plainfield argued that the residents of Oxford House were current users of illegal drugs and excluded from the definition of handicapped individuals. Judge Sarokin stated that the City's evidence of a high turnover rate did not itself demonstrate that the residents were current users of illegal drugs. He noted that the Oxford House rules mandate that no resident can use drugs and remain in the house. The City attempted to argue that the burden of proving that the residents of Oxford House were not current users was on Oxford House. Judge Sarokin strongly implied, however, that such a burden to establish an exception under the Act falls upon the City, not the residents. 769 F. Supp. at 1342 n. 15.
*39 Once Oxford House proved that the residents were handicapped under the Federal Act, the judge said it then must also prove either intentional discrimination or a discriminatory impact. The City of Plainfield argued that an exclusionary impact, if any, was based on the City's legitimate interest in permanence of residency and not on discrimination. The judge responded to that contention by noting the record suggested that this stated interest in permanency could actually be a pretext for underlying discrimination. The judge also suggested that notions of "`permanence' may be [an] inappropriate basis for [a] zoning ordinance." Id. at 1336 n. 6, 1344 n. 20. He also sagely observed that "if the exclusionary effect of the City's actions were upheld, and were duplicated state-wide, no Oxford Houses could exist in New Jersey." Ibid.
Judge Sarokin concluded in Plainfield that Oxford House had demonstrated the likelihood of success required for preliminary injunction. He also concluded that: (1) Oxford House had demonstrated an irreparable injury, (2) the City of Plainfield had failed to demonstrate any severe harm that they would suffer if the injunction was granted, and (3) the public interest was in favor of allowing the Oxford House's operation. Based on these findings, he granted Oxford House preliminary injunctive relief pending resolution of the parallel state proceeding.

Audubon
In United States v. Borough of Audubon, 797 F. Supp. 353 (D.N.J., 1991), aff'd o.b., 968 F.2d 14 (3d Cir.1992) (Audubon), Chief Judge Gerry held that the Borough of Audubon had discriminated against the residents of Oxford House in violation of the Federal Fair Housing Act. The Third Circuit summarily affirmed. The Civil Rights Division of the United States Department of Justice prosecuted the Borough of Audubon in this case for discrimination against Oxford House. The judge observed that courts have "uniformly held" that recovering drug and alcohol abusers are "handicapped" as defined under the *40 Federal Rehabilitation Act, 29 U.S.C.A. § 706(8)(B), the same definition as in the Federal Fair Housing Act. Id. at 358.
Judge Gerry held that Audubon violated section 3604(f) of the Federal Fair Housing Act by taking actions "to make unavailable or deny" housing "because of a handicap." Id. at 362. He held that Audubon also violated section 3617 of that act by taking actions to "coerce, intimidate, threaten, or interfere" with the Oxford House residents. Ibid. He also found that "Oxford Houses are not health care facilities, rehabilitation centers, or supervised half-way houses.... Instead, such houses are simply residential dwellings that are rented by a group of individuals who are recovering from alcoholism or drug addiction." Id. at 355. The judge imposed a $10,000 fine and injunctive relief against the Borough's interference with the residents of Oxford House based on the Federal Fair Housing Act's provision for protection of "handicapped" recovering substance abusers.

Cherry Hill
The third federal case addressing the issue of whether Oxford House residents are protected under the Federal Fair Housing Act involved a situation similar to the case before us. In Oxford House, Inc. v. Township of Cherry Hill, 799 F. Supp. 450 (D.N.J. 1992) (Cherry Hill), Judge Gerry issued a preliminary injunction against the Township of Cherry Hill from interfering with Oxford House's occupancy of a single-family home at 911 South Kings Highway in Cherry Hill.
In his factual discussion, Judge Gerry briefly addressed the two Cherry Hill homes involved in the case before us, 141 Pine Valley Road and 108 Hilltop Court. He noted:
None of the residents of those properties have been charged with any violation of any municipal ordinance in connection with their conduct at the residences, and none of those residents have been arrested for unauthorized use of drugs or alcohol at the premises. William Ragozine, the Director of Community Development for Cherry Hill, testified that neither he nor his department have any information indicating that the presence of these houses has had any adverse impact on the surrounding neighborhoods. [Id. at 455.]
*41 In Cherry Hill, the Township refused to issue Oxford House a certificate of occupancy for 911 South Kings Highway on the ground that it failed to meet the definition of a "single family" under the Township's zoning ordinance. Without this certificate, plaintiffs were prohibited from occupying the house.
Regarding the Township's zoning ordinance, Judge Gerry stated:
Cherry Hill interprets this ordinance so as to impose more stringent requirements on groups of unrelated individuals seeking to rent a single family home than on groups who are related by blood or marriage. While groups related by blood or marriage who apply for a [certificate of occupancy] are automatically considered to meet the definition of family under the zoning ordinance, a group of unrelated individuals is initially presumed not to constitute a family. In order to obtain a [certificate of occupancy], a group of unrelated individuals must prove that they meet a standard of "permanency and stability." This standard is never imposed on groups related by blood or marriage because they are automatically found to meet this definition of "family" regardless of their particular circumstances. This "permanency instability" standard is not referred to or defined anywhere in the zoning ordinance, and the Township has no written criteria according to which the standard may be uniformly applied. [Id.]
When addressing the preliminary injunction standard of "likelihood of success" regarding the Federal Fair Housing Act, Judge Gerry said that he was not required to "defer" to the Chancery judge's decision in the case before us. While not explicitly disagreeing with the Chancery judge's findings, Judge Gerry did state that he did not "feel compelled to treat as persuasive precedent the decision of a State court with respect to an issue of federal law." Id. at 458 n. 16.
Judge Gerry then proceeded, as in Audubon, to address the definition of handicap under the Federal Fair Housing Act. He held that "as a matter of law" alcoholism and drug addiction (excluding current drug use), constituted an impairment under the Act. He said that some specific factual showing must be made that a plaintiff's alcoholism or drug addiction "substantially limits [a] major life activity." Id. at 459. To this purpose, Judge Gerry relied on the expert testimony of Riley Regan, Executive Director of the Governor's Council on Alcoholism and Drug Abuse, with regard to the limitations faced by *42 alcoholics and drug addicts in general, and stated that this "is sufficient at this early stage in the proceedings to meet plaintiff's present burden of showing a likelihood of success on the merits." This same expert opinion evidence was presented to the Chancery judge in the case before us.
Judge Gerry also found that plaintiffs had established a prima facie case of disparate impact "by showing that the Township's interpretation of the definition of `family' in its zoning ordinance imposes more stringent requirements on groups of unrelated individuals wishing to live together in a rental property than on individuals related by blood or marriage." Id. at 461. On these findings, he concluded that the residents of Oxford House were protected presumptively under the Federal Fair Housing Act and entitled to preliminary injunctive relief.
Our research discloses no other published Oxford House zoning cases in any other state or federal court.

IV
Before addressing the substantive issues in this case, we discuss the procedural posture of the case before the Chancery Division. The only motions which were considered at the August 14, 1991 hearing before the Chancery judge were the Township's motion for a preliminary injunction and Oxford House's motion for summary judgment. Clearly, the Chancery judge denied Oxford House's summary judgment motion. His decision, however, effectively granted not only a preliminary injunction, but also summary judgment for a permanent mandatory injunction to the Township. The Township itself describes the Chancery Division judge's ruling as effectively a grant of summary judgment in its favor.
The requirements for a preliminary injunction are well known: (1) plaintiffs are subject to irreparable harm, (2) the legal right underlying plaintiff's claim is well settled, (3) all material facts are uncontroverted, and (4) the relative degree of *43 hardship favors granting the injunction. See Crowe v. De Gioia, 90 N.J. 126, 132-34, 447 A.2d 173 (1982). Applying these standards, we conclude that the Chancery judge erred in granting the Township's motion for injunctive relief. First, there was no irreparable harm to the Township. There concededly had been no problems with the residents of Oxford House: no arrests, no police involvement, no registered complaints, nothing. Second, in light of the two federal cases involving Oxford House (Plainfield and Audubon) which had been decided at the time that the Chancery judge issued his ruling, the legal right underlying plaintiff's claim was anything but well settled. In fact, both federal cases suggested rather strongly that Oxford House eventually would likely succeed on the factual merits. Third, as discussed in Crowe, the issue respecting uncontroverted facts is a function of whether a disruption of the status quo is warranted pending a full hearing on the merits. In the case before us, the status quo shows the residents living peacefully in the Oxford Houses. The Township failed to present any factual support for the contention that the residents must be evicted prior to a full hearing in order to prevent danger or harm to the community. Fourth, the relative hardship weighed in favor of denying the Township's motion for a preliminary injunction. There was evidence of substantial harm to the residents of Oxford House  they would be evicted from their homes, almost surely on a permanent basis in these circumstances if the leases were lost, while the Township did not present any evidence of irreparable harm. Without satisfying these requirements, we see no justification for making the residents vacate the houses prior to a final hearing.
As to the procedural context of the ruling, the Township emphasizes that it reached an agreement with Oxford House "to rest upon prior submissions to the Court and not to present live testimony...." The Township claims it is "ironic" that Oxford House argues that the Chancery Division judge "had no legal right to order the final disposition of the case and removal *44 of the occupants" after Oxford House itself had moved for summary judgment.
The Township's claim in this respect is without merit. The fact that there may have been sufficient questions of fact to deny one party's motion for summary judgment does not mean that summary judgment must be entered, without a motion, for the other party. O'Keeffe v. Snyder, 83 N.J. 478, 487, 416 A.2d 862 (1980) ("Cross-motions do not warrant granting summary judgment unless one of the moving parties is entitled to judgment as a matter of law"). And cross-motions for summary judgment do not preclude the existence of issues of fact. Ibid. Based on this concern alone, a remand to the Chancery Division is required. As discussed next, however, the record before us requires reversal of the order for injunctive relief based on (1) the unconstitutionality of the ordinance's definition of family and (2) the potential violation of the Federal Fair Housing Act.

V
As observed, Cherry Hill's Ordinance 76-71, adopted in 1976, defines a "family" as:
a single individual, doing his own cooking, and living upon the premises as a separate housekeeping unit, or a collective body of persons doing their own cooking and living together upon the premises as a separate housekeeping unit in a domestic relationship based upon birth, marriage or other domestic bond.
The language "or other domestic bond" becomes critical. The ordinance does not define the standard any further and is tautological. Our Supreme Court has held that "the standard for determining whether a use qualifies as a single housekeeping unit must be functional, and hence capable of being met by either related or unrelated persons." Borough of Glassboro v. Vallorosi, 117 N.J. 421, 431, 568 A.2d 888 (1990). The ordinance challenged in Vallorosi, which the Court upheld, defined a "family" as "one or more persons occupying a dwelling unit as a single non-profit housekeeping unit, who are living together as a stable and permanent living unit, being a traditional *45 family unit or the functional equivalency [sic] thereof." Id. at 423, 568 A.2d 888, quoting Glassboro, N.J., Code § 107-3 (1986).
In Vallorosi, ten students at Glassboro State College were renting a house from one of the student's parents. The students intended to remain tenants as long as they were enrolled at the college. The Borough sought to evict the students, claiming that they did not constitute a more traditional family as defined in the Borough's zoning ordinance. The Supreme Court in Vallorosi stated, "The courts of this state have consistently invalidated zoning ordinances intended `to cure or prevent ... anti-social conduct in dwelling situations.'" 117 N.J. at 426, 568 A.2d 888, quoting Kirsch Holding Co. v. Borough of Manasquan, 59 N.J. 241, 253-54, 281 A.2d 513 (1971). The Court also announced that "an ordinance limiting the term `family' to persons related by blood, marriage, or adoption cannot `satisfy the demands of due process.'" 117 N.J. at 428, 568 A.2d 888, quoting Berger v. State, 71 N.J. 206, 223, 364 A.2d 993 (1976). The Court stressed that the defining concept behind a one-family dwelling is "its character as a single housekeeping unit." 117 N.J. at 427, 568 A.2d 888, quoting Berger, supra, 71 N.J. at 227, 364 A.2d 993.
We must first consider whether the zoning ordinance, either on its face or as applied, provides a "functional" standard defining a "single housekeeping unit" which is "capable of being met by either related or unrelated persons." 117 N.J. at 431, 568 A.2d 888. If it does not, it does not pass constitutional muster. If it does, the second question is whether the residents constitute a "single housekeeping unit," according to a functional standard.
In Vallorosi, the Court really refrained from ever examining the first issue, because it defined the "narrow" question before it as "whether there is sufficient credible evidence to sustain the trial court's factual finding that" the ten college students constituted a family under the definition in the Glassboro *46 ordinance. Id. 117 N.J. at 432, 568 A.2d 888. Of course, if the trial judge in Vallorosi had found that the residents did not constitute a family, as the Chancery judge did in the case before us, then the Court would have been required to address the constitutionality of the ordinance. Because of the Chancery judge's ruling in favor of the Township of Cherry Hill as a matter of law, we must examine the facial constitutionality of the ordinance, as well as its potential for discriminatory application and enforcement.
The constitutional inquiry is a difficult and imprecise venture.[1] In Open Door Alcoholism Program, Inc. v. Board of Adjustment, 200 N.J. Super. 191, 491 A.2d 17 (App.Div. 1985), a New Brunswick zoning ordinance defined a family as "one or more persons related by blood or marriage, or up to three unrelated individuals, living as a single housekeeping unit in a dwelling unit." Id. at 197, 491 A.2d 17. The plaintiff proposed operating a New Brunswick residence as a "halfway house" for ten recovering alcoholics. The proposed house in Open Door *47 seems quite different from the existing Cherry Hill Oxford Houses in the case before us. In Open Door, a house manager would administer the operation of the house; in Oxford Houses the residents run the administration of the house. In Open Door certified alcoholism counselors would conduct mandatory group therapy sessions in the house; in Oxford Houses there are no therapy sessions but simply routine, daily living. In Open Door visitors were only allowed in certain open areas by the management's rule; in Oxford Houses there are no restrictions on visitors, unless the residents personally elect to have such a restriction. In Open Door the residents were under an 11 p.m. curfew; in Oxford Houses there are no curfew restrictions. The proposed Open Door facility more resembled a residential treatment center than an ordinary residence as Oxford Houses resemble. The impression we receive is that Open Door involved constant turnover of occupants, not a design for relatively permanent residents which the Oxford House model does.
The New Brunswick Zoning Board concluded that the Open Door proposal was for a nonconforming use and revoked the challenged building permit. In affirming this decision, the trial judge had indicated that the degree of "permanency" was significant. Specifically, the judge stated that "if there would be some indication that these persons were going to remain there for an indefinite period of time, I would have no hesitancy in granting your [plaintiff's] relief...." Id. 200 N.J. Super. at 196, 491 A.2d 17.
On appeal, a panel of our court held: "Limiting a single-family dwelling to occupancy by no more than three unrelated individuals living as a single housekeeping unit is an improper zoning restriction." Id. at 197, 491 A.2d 17. We then discussed whether the residents satisfied the definition of a family as interpreted by our Court. "The controlling factor in considering whether a group of unrelated individuals living together as a single housekeeping unit constitutes a family, for purposes of compliance with a single-family zoning restriction, is whether *48 the residents bear the generic character of a relatively permanent functioning family unit." Ibid., citing State v. Baker, 81 N.J. 99, 108-09, 405 A.2d 368 (1979). Baker obviously leaves the specific defining function to local governments. The Baker Court was advising local governments as to how they may draft their definitions of "family"; the Court was not setting forth a universal prescription for the definition of "family."
We concluded that the residents in Open Door, "although comprising a single housekeeping unit, would not bear these generic characteristics of a single family." 200 N.J. Super. at 200, 491 A.2d 17. We essentially ruled that the proposed Open Door facility would be a boarding house, not a family home. We did not set forth a specific definition of "family." If a municipality desires to require specific "characteristics of a single family," it must set forth those requirements in a "functional" standard which is "capable of being met by either related or unrelated persons." Vallorosi, supra, 117 N.J. at 431, 568 A.2d 888. We did not set forth any detailed characteristics of a "family" in Open Door. That task is for the local governing body.
By applying the first stage of this analysis to the case before us, the Township's definition of "family" is unconstitutional because it distinguishes between related and unrelated individuals and leaves only the totally amorphous standard of "domestic bond." The Township's Director of Community Development, William Ragozine, testified in his deposition that "as long as you are living together and related by blood or marriage you are entitled to live under the Township's zoning ordinance in districts zoned for one-family detached dwellings." If the residents are not related, they must still somehow satisfy the "domestic bond" requirement. This distinction between related and unrelated persons is unconstitutional under Vallorosi and Baker.
The record suggests strongly that the Township is not applying the "domestic bond" requirement to all unrelated residents *49 of single-family homes in the Township. There are no criteria described in the ordinance to apply in order to reach an objective or rational determination of whether a group of people demonstrate a sufficient "domestic bond." Instead, the Township apparently simply makes this determination on an ad hoc administrative basis or tells the citizens to seek relief from the zoning board.[2]
*50 With the first stage of the analysis complete, and the distinction between related and unrelated individuals is removed from the ordinance, we are left with stage two. This stage requires that we decide whether the Oxford House residents are "doing their own cooking and living together upon the premises as a separate housekeeping unit," the Township's definition of family with the unconstitutional portion excised. From the evidence in the record before us, the Oxford House residents certainly seem prima facie to satisfy this definition.
Based on the somewhat limited record before him at the August 14, 1991 hearing, the Chancery judge concluded:
From this history, the operation of these houses at best appear to be chaotic. Most assuredly, they in no way bear the generic character of a family unit as a relatively permanent household. These groups, from the record evidence, can not be viewed as emulating family life and presenting to all outward appearances a relatively normal, stable and permanent family unit. A contrary conclusion would hasten the death and internment of the very word "family." As was stated by the Court in City of White Plains v. Ferraioli, [34 N.Y.2d 300, 357 N.Y.S.2d 449], 313 N.E.2d 756 (N.Y. 1974). So long as the group home bears the generic characteristic of a family unit as a relatively permanent household, and is not a framework for transients or transient living it conforms to the purpose of the ordinance.
This court recognizes that life is transitory, related family units experience change as children grow, spouses die and other family members join and expand the basic household, however, this case is a gross deviation from that norm. Additionally, this court does not deprecate the therapeutic value of peer support for recovering alcoholics, Open Door, supra, 200 N.J. Super. at 200 [491 A.2d 17], or recovering drug abusers. However, more than statements of laudable intentions are required to establish that a group has taken on the generic character of the traditional family. Enlarging the definition of "family" to include these Oxford Houses, on the record evidence, distorts the definition of family to an impermissible level, under both the guise of the statute and common usage. See Group House of Port Washington, Inc. v. Board of Zoning and Appeals [45 N.Y.2d 266, 408 N.Y.S.2d 377], 380 N.E.2d 207, 211 (N.Y. 1978).
Accordingly, for the reasons already expressed, Oxford House of Pine Valley and Oxford House of Hilltop do not, from the record made, constitute a family as defined by the Cherry Hill Ordinance.
*51 This analysis is flawed. If the Township requires "permanence and stability" as part of its definition of family, it must include these requirements in its ordinance. It did not. The Chancery judge exceeded the limits of his power by recrafting the ordinance with these requirements. The ordinance as written requires only a "domestic relationship" or "other domestic bond" than birth or marriage. The Township must draft the ordinance; the judiciary does not have the duty to create or redraft local legislation to bring it within constitutional limits. See Riggs v. Long Beach Tp., 109 N.J. 601, 612-13, 538 A.2d 808 (1988).
In Plainfield, Federal Judge Sarokin suggested that such a focus on "permanence" may be "misplaced" in light of the United States Supreme Court's suggestions in Village of Belle Terre v. Boraas, 416 U.S. 1, 7, 94 S.Ct. 1536, 1540, 39 L.Ed.2d 797, 803 (1974), that an ordinance may not be "aimed at transients" specifically. Plainfield, 769 F. Supp. 1329 (D.N.J. 1991). The requirement of "permanence and stability" was apparently tolerated to some extent by our Court in Vallorosi; however, Glassboro's local ordinance explicitly set forth those two elements which were examined in the specific local context of university housing. Cherry Hill Township did not do this. We also note, as our Supreme Court did in Vallorosi, that the Township is free to include in its zoning definition of family, functional criteria such as a provision that limits occupancy by number in reasonable relationship to available sleeping and bathroom facilities or a "minimum amount of habitable floor area per occupant," or other density type requirements. 117 N.J. at 428, 568 A.2d 888. Such criteria appropriately deal with overcrowding or congestion. Ibid; see also State v. Baker, supra, 81 N.J. at 109, 111, 405 A.2d 368 (space-related occupancy limitations and limit on number of cars approved).[3] Finally, *52 we caution that a municipality may not use its certificate of occupancy ordinance to regulate zoning. See Ocean County Realtor Bd. v. Beachwood Borough, 248 N.J. Super. 241, 245-47, 590 A.2d 736 (Law Div. 1991); Mahwah Twp. v. Landscaping Tech., 230 N.J. Super. 106, 552 A.2d 1021 (App.Div. 1989); William Cox, New Jersey Zoning and Land Use Administration 331 (1992).

VI
Under the Federal Fair Housing Act, 42 U.S.C.A. § 3602(h):
"Handicap" means, with respect to a person 
(1) a physical or mental impairment which substantially limits one or more of such person's major life activities,
(2) a record of having such an impairment, or
(3) being regarded as having such an impairment,
but such term does not include current, illegal use of or addiction to a controlled substance....
The three recent federal cases discussed have addressed the issue of whether Oxford House residents qualify for protection under the Federal Fair Housing Act. Plainfield, 769 F. Supp. 1329 (D.N.J. 1991); Audubon, 797 F. Supp. 353 (D.N.J. 1991), aff'd o.b., 968 F.2d 14 (3d Cir.1992); Cherry Hill, 799 F. Supp. 450 (D.N.J. 1992). All three cases concluded that the residents of Oxford House, if they truly are recovering alcoholics and addicts, are protected as handicapped individuals under the Fair Housing Act. We also recognize that alcoholism is a handicap covered by the New Jersey Law Against Discrimination, N.J.S.A. 10:5-1- to -42. Clowes v. Terminix Int'l Inc., 109 N.J. 575, 594, 538 A.2d 794 (1988). See Sica v. Board of Adjustment of Tp. of Wall, 127 N.J. 152, 160, 603 A.2d 30 (1992) (standard for (d) variance for an inherently beneficial use).
*53 The Chancery judge here concluded that the residents of Oxford House "were current users at the time of their admission" to the houses and "cannot be `regarded as having an impairment.'" We conclude that the evidence in this record in April 1992 was insufficient to reach such a finding as a matter of law. In reaching his decision, the Chancery judge relied in part on deposition testimony regarding when each resident had his last drink or drug before moving into Oxford House. The Chancery judge concluded that the residents were "current users" at the time they moved into Oxford House because some of the residents testified that their last drink or drug use had occurred several weeks before moving in to Oxford House. In interpreting this federal law, the federal courts of this district have held that such testimony does not equate with current use. There was no evidence that any residents had used drugs or alcohol while living in Oxford House and were allowed to remain in either Oxford House residence. Indeed, the evidence about the characterizations of the current residents was quite stale at the time of adjudication in late April 1992. The evidence really dwelled on the initial residents when they had arrived nearly two years earlier in the summer of 1990.
In Plainfield, Judge Sarokin noted that the Oxford House rules mandate that no resident can use drugs and remain in the house. Plainfield attempted to argue that the burden of proving that the residents of Oxford House were not current users was on Oxford House. Judge Sarokin thought, however, that such a burden probably fell upon the City of Plainfield. 769 F. Supp. at 1342 n. 15. If the Oxford House residents are considered handicapped under the Federal Act, the court must determine whether the residents demonstrated discriminatory treatment in either effect or intent. Discriminatory intent could perhaps be inferred from the procedural context since the Cherry Hill enforcement authorities testified that to their knowledge this case represented the first time that the Township has attempted to enforce its certificate of occupancy *54 ordinance to prevent the rental and occupancy of a single-family home.
In Plainfield, the federal judge examined the discriminatory impact of the City's ordinance and, as we observed before, said that "if the exclusionary effect of the City's actions were upheld, and were duplicated state-wide, no Oxford Houses could exist in New Jersey." Id. at 1344. This same statement can be made about Cherry Hill's actions. If we uphold Cherry Hill's position in this case, no Oxford House residents could now live anywhere in this town of 70,000 people without special municipal permission of some sort. There is currently no zone in Cherry Hill where an Oxford House would be permitted. This result completely contradicts the policy of both the State and federal governments in supporting the development of Oxford Houses as part of society's strategy against substance abuse. Moreover, procedural history alone may suggest discriminatory intent. Id. at 1343. Here, the Township apparently instituted legal proceedings without making any inquiry as to whether the residents of Oxford House constituted a "family" under the Township's zoning schemes. One could suspect that the residents were targeted from the start solely because of their background.
The evidence in this case about the nature of the occupancy and the character of the residents is quite similar to the evidence presented in the three federal cases. We are not controlled by the decisions of the lower federal courts, even on issues of federal statutory construction. See Dewey v. R.J. Reynolds Tobacco Co., 121 N.J. 69, 79-80, 577 A.2d 1239 (1990). However, lower federal court decisions must "be accorded due respect, particularly when they are in agreement," id. at 80, to insure uniformity, guarantee judicial certainty, and discourage forum shopping. In this spirit, we adhere to the legal interpretation of the Federal Fair Housing Act reached by the federal cases.
*55 Counsel for Oxford House urges us to simply follow and adopt Judge Gerry's finding of discriminatory intent and impact in Cherry Hill, supra, 799 F. Supp. 450, where he preliminarily enjoined the Township from interfering with the occupancy of the Oxford House at 911 Kings Highway. Counsel for Oxford House stresses the testimony of William Ragozine, Director of Community Development, that a group of unrelated individuals cannot live in a single-family detached dwelling zone without special permission and the judge's finding to that effect in the federal case. Id. at 455, n. 7. But we prefer not to adopt the record and findings wholesale from the federal Cherry Hill case. We think it sufficient for our task to conclude that there is enough doubt both legally and factually in this record before us about Cherry Hill's use of discriminatory practices, as defined by the Federal Act, to preclude the Township's entitlement to a preliminary or final injunction evicting the residents and to require a plenary hearing on the federal claims of discrimination. If the decision to deny occupancy permits was based on the residents' handicap as defined by federal law, and this is proved at a final hearing, relief under the Federal Act must ineluctably follow. We will not presume any ill motives of the Township on this paper record.
We stress that the Oxford Houses in this case have, and must continue to, abide by all appropriate property maintenance codes. We also are aware that the federal guidelines under the Anti-Drug Abuse Act of 1988, 42 U.S.C.A. § 300X-4a, suggest the possibility of the several states establishing "quality control" groups "whose general purpose would be to see that the program is operated in a legal, viable, and effective manner." 54 Fed.Reg. 15810 (1989). Perhaps the establishment of such a quality control by our State's legislative or executive branches of government would alleviate the concerns of the Oxford House neighbors who so often appear as the driving force behind these lawsuits to keep Oxford House residences out of *56 their communities. If there is indeed a regulatory void[4] concerning these homes which needs addressing, the courts cannot fill it indefinitely on a case-by-case basis.
Finally, we stress that relief under the Federal Act is available only where the Oxford Houses, or similar types of residences, actually are maintained for recovering alcoholics and addicts. The federal statute clearly does not sanction harbors or havens for people currently using drugs or alcohol. Plainfield, 769 F. Supp. at 1342; see 42 U.S.C.A. § 3602(h). The Oxford House model in this regard contemplates accommodating the traditional recovery process, ideally after the residents have gone through a detoxification and a medical rehabilitation process, not residents literally brought in "right off the street." Obviously, a loosely-organized and undisciplined program can lead to abuses, disruption of a neighborhood, and economic exploitation. This result is not condoned by the Oxford House model, and certainly not by us.

VII
Judge Serpentelli recently summarized our concerns most articulately.
[O]ur courts have struggled to accommodate the competing interests of municipalities and property owners. On the one hand, our courts have recognized the right of a municipality to "secure and maintain `the blessings of quiet seclusion' and to make available to its inhabitants the refreshment of repose *57 and the tranquility of solitude." ... On the other hand, our courts have consistently invalidated ordinances which unnecessarily and excessively restrict the use of private property. [Ocean County v. Long Beach Township, 252 N.J. Super. 443, 450, 599 A.2d 1309 (Law Div. 1991).]
In this case the various interest groups in local government and the community, while in conflict, have continued the search for the appropriate balance between their competing interest.
We reverse the Chancery judge's grant of injunctive relief evicting the residents. We find the Township's ordinance concerning permissible "domestic" arrangements unconstitutionally vague. We also find that Oxford House residents, if truly recovering substance abusers, are protected under the Federal Fair Housing Act. We conclude that any adjudication on that issue requires a final, plenary hearing.
In a municipality's attempt to secure "the blessings of quiet seclusion" for its residents, Village of Belle Terre v. Boraas, supra, 416 U.S. at 9, 94 S.Ct. at 1541, 39 L.Ed.2d at 804, it must be careful not to exclude groups of people based on their personal characteristics. Unfortunately, attempts at this kind of exclusion have occurred throughout our history.
In the 1960's exclusion was based on race. Our courts did not allow this. Jones v. Haridor Realty Corp., 37 N.J. 384, 181 A.2d 481 (1962). In the 1970's exclusion was based on the fact that the residents were unrelated by blood or marriage. Our courts did not allow this. State v. Baker, 81 N.J. 99, 405 A.2d 368 (1979). In the 1980's exclusion was based on income and distribution of wealth. Our courts did not allow this. Southern Burlington County N.A.A.C.P. v. Mount Laurel Tp., 92 N.J. 158, 456 A.2d 390 (1989). Now, in the 1990's, if exclusion is based solely on the disability or handicap of recovery from prior drug or alcohol abuse and addiction, we cannot allow this.
The order granting the Township the injunctive relief of eviction is reversed; the order denying summary judgment to Oxford House is affirmed in part and reversed in part; the matter is remanded for further proceedings.
NOTES
[1] See N.J. Const. art. I, ¶ 1; art. IV, § 6, ¶ 2.

Article I, par. 1 of our Constitution ensures the natural and unalienable right of individuals to pursue and obtain safety and happiness. Encompassed within its strictures is the requirement of due process upon which today's analysis is based. In addition, we would be remiss if we did not note that the right of privacy is also included within the protection offered by that provision. See, e.g., State v. Saunders, 75 N.J. 200 [381 A.2d 333] (1977). Although this right is not absolute, it may be restricted only when necessary to promote a compelling government interest. Article IV, § 6, par. 2 expressly provides that the power to zone shall be deemed to be within the police power of the State. We have, however, interpreted that provision as mandating that zoning regulations reasonably promote the welfare of the public as a whole. See So. Burlington Cty. NAACP v. Tp. of Mt. Laurel, [67 N.J. 151, 336 A.2d 713 (1975)]. These provisions, when read together, require that zoning restrictions be accomplished in the manner which least impacts upon the right of individuals to order their lives as they see fit. For the reasons contained herein, the Plainfield regulation fails this test. Thus, it violates the right of privacy and due process. [State v. Baker, 81 N.J. 99, 114 n. 10, 405 A.2d 368 (1979); see Robert F. Williams, The New Jersey State Constitution: A Reference Guide 30-31 (1990).]
[2] The difficulty of applying the domestic relationship or other domestic bond, than blood or marriage, test in the 1976 Cherry Hill ordinance is demonstrated by the statement of Michael Cohler, Zoning Board Member, when voting with the 4-3 majority on November 19, 1992 against an interpretation in favor of allowing Oxford House an occupancy permit. He said when voting:

Well, this is certainly the hardest case that's come before our Board, at least as far as I'm concerned. When we evaluate a situation such as this one we have to try and be all things to all people. On the one hand how can we not applaud the efforts of every single member of those two households tonight and I know the residents of the neighborhoods where the two households are located are fully supportive of all the efforts and the energies and the commitments that all of you have made. But on the other hand we're tasked with the responsibility of trying to determine to define what the meaning of a family is and it's a said situation that they leave us with such a vague terminology defined as other domestic bonds.
You know, other domestic bonds to me is too vague. I don't even know what they mean when they wrote that down but that's what we're tasked with here tonight. I listened to the testimony. I guess what I didn't hear enough of is the responsibility. I know when I think of family I think of the responsibility somewhere. Someone is tasked in that household to be responsible. It's certainly not going to be the two-year old or five-year old but if the two-year old or five-year old crosses into my property and destroys my property I want to know I have somebody  I want to know that my neighbor has somebody in that household or family who is responsible that I can go to. And I haven't been made or convinced that there is a responsible party in that house. There are responsible parties. There's an aggregate but I don't see one main responsible party that I would go to. Also in addition to that what I also share with the rest of the members of the Board is that I think of a family and I'll just echo the sentiments of Mr. Jeffreys where there is some permanence and it's not transitory all the time because it makes it very difficult for me in my mind to define family as a situation that's constantly changing, evolving, whatever else is going on.
Again, it's a very tough decision but I think that I guess after hearing all the testimony I would have to lean more towards in favor of I guess denying this interpretation, denying it as a family.
[3] One scholarly work has developed definitional criteria for "family, group care facility, group family household, and group living quarters" for use in planning and zoning discourse. See Harvey S. Moskowitz & Carl G. Lindbloom, The Illustrated Book of Development Definitions 84, 98 (1981).
[4] Some may cautiously but quite legitimately contend that residences like Oxford Houses should meet State requirements akin to current regulations for health care facilities, nursing homes, boarding homes, and so forth, to prevent recovering alcoholics or drug users from being "dumped" in fire-traps or unsanitary or unsafe personal environments. See, e.g., N.J.S.A. 30:11A-1 to -14 and N.J.S.A. 26:2H-1 to -52 (residential health care facilities), N.J.A.C. 10:39-1.1 to -7.1 (community residence licensure standards, policies and procedures). Such abuses were consequent upon the depopulation of our mental institutions in the 1970's and 1980's. Alert but compassionate and rational regulation in this respect, if a perceived necessity, is the appropriate arena of the legislative and executive branches of government which, by their "start-up" funding, have encouraged these Oxford House models.